# IN THE SUPREME COURT OF IOWA

No. 11–1543

Filed April 12, 2013

**QWEST CORPORATION,**

Appellee,

vs.

**IOWA STATE BOARD OF TAX REVIEW,**

Appellant.

Appeal from the Iowa District Court for Polk County, Joel D. Novak, Judge.

The State appeals from a judgment in a judicial review proceeding finding that the disparate tax treatment of the personal property of incumbent local exchange carriers, as contrasted with that of competitive long distance companies and wireless providers, violates the equal protection clause of the Iowa Constitution. **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Thomas J. Miller, Attorney General, Donald D. Stanley, Jr., Special Assistant Attorney General, and James D. Miller, Assistant Attorney General, for appellant.

Bruce W. Baker of Nyemaster Goode, P.C., Des Moines, Richard G. Smith of Hawley Troxell Ennis & Hawley LLP, Boise, Idaho, and Roy A. Adkins, Denver, Colorado, for appellee.

**MANSFIELD, Justice.**

This administrative review proceeding requires us to decide whether imposing a tax on the Iowa-based personal property of incumbent local exchange carriers, but not on that of competitive long distance and wireless service providers, violates article I, section 6 of the Iowa Constitution. We conclude it does not. The differential tax treatment of these enterprises is rationally related to legitimate state interests in encouraging the development of new competitive telecommunications infrastructure, while raising revenue from those providers that historically had a regulated monopoly and continue to enjoy some advantages of that monopoly. Accordingly, we reverse the judgment of the district court and uphold the Iowa State Board of Tax Review's assessment on Qwest Corporation.

## I. Background Facts and Proceedings.

The facts in this case are largely undisputed. A generation ago, the American Telephone & Telegraph Company (AT&T) had a dominant position nationally in both local and long-distance telephone service. In Iowa, it did business under the name Northwestern Bell. Most Iowans obtained their local and long-distance phone service through Northwestern Bell. The company owned and maintained lines that ran from Iowa residences and businesses into central offices, where switching equipment was used to route phone calls toward their ultimate destination. Those Iowans who did not get their phone service from Northwestern Bell primarily relied on another local monopoly, such as GTE.

As the result of a lengthy antitrust case, a consent decree was entered in 1982, which ended AT&T's national industry dominance. The decree took effect in 1984 and required AT&T to divest its local telephone

businesses. This led to the formation of seven independent regional Bell operating companies, one of which was U S West, Inc., the predecessor to Qwest Corporation. U S West thereafter provided local landline telephone service in fourteen states, including Iowa and the rest of the former Northwestern Bell territory.

Although the divestiture was the death knell for a single telephone company's predominance in this country, it did leave in place a system where local phone service was generally provided by monopoly carriers that had the existing infrastructure to do so (e.g., central offices, switches, and customer phone lines). To address this situation, Congress and the states enacted legislation in the mid-1990s. The Telecommunications Act of 1996 (Telecom Act) required incumbent local exchange carriers (ILECs) like U S West to provide interconnection to their networks and to offer their network elements, such as the hardwired phone lines that entered homes, on an "unbundled" basis to other carriers (CLECs) that sought to enter the marketplace and compete with them. *See* Telecommunications Act of 1996, Pub. L. 104–104, 110 Stat. 56 (codified in scattered sections of 47 U.S.C.)

Complementing the Telecom Act was House File 518, which had been passed by our general assembly the year before. *See* 1995 Iowa Acts ch. 199 (current version at Iowa Code §§ 476.95–.101 (2013)). Like the Telecom Act, House File 518 required any ILEC to provide "interconnection" and to make available the "unbundled essential facilities of its network." *See id.* § 12 (current version at Iowa Code § 476.101(4)(*a*)(1)). The section entitled "Findings—statement of policy," expressly sets forth certain purposes of the act, as follows:

> 1. Communications services should be available throughout the state at just, reasonable, and affordable rates from a variety of providers.

2. In rendering decisions with respect to regulation of telecommunications companies, the board shall consider the effects of its decisions on competition in telecommunications markets and, to the extent reasonable and lawful, shall act to further the development of competition in those markets.

3. In order to encourage competition for all telecommunications services, the board should address issues relating to the movement of prices toward cost and the removal of subsidies in the existing price structure of the incumbent local exchange carrier.

4. Regulatory flexibility is appropriate when competition provides customers with competitive choices in the variety, quality, and pricing of communications services, and when consistent with consumer protection and other relevant public interests.

5. The board should respond with speed and flexibility to changes in the communications industry.

6. Economic development can be fostered by the existence of advanced communications networks.

Iowa Code § 476.95. Thus, the legislature's stated purposes for the act can be interpreted as enhancing the availability of affordable communication services throughout the state, encouraging competition for all telecommunication services, and fostering economic development.

Prior to 1995, ILECs in Iowa like Northwestern Bell/U S West had been subject to rate-base/rate-of-return regulation. *See* 1963 Iowa Acts ch. 286, § 1 (current version at Iowa Code § 476.8 (2013)). Under this system of regulation, the incumbent carrier essentially received a guarantee that its costs plus a reasonable rate of return would be covered by the tariffs paid by Iowa customers, so long as the company's costs were reasonable. *See id.* House File 518, however, gave local phone companies the option of exiting from this form of regulation by submitting a "price regulation plan" that, if approved, would set forth the price for "basic communications services" subject to permitted adjustments. *See* 1995 Iowa Acts ch. 199, § 8 (current version at Iowa

Code § 476.97). In 1998, U S West opted for such a voluntary price regulation plan and, consequently, was no longer subject to rate-base/rate-of-return regulation.

The Telecom Act and its Iowa counterpart resulted in an increased CLEC presence in Iowa. From 2000 to 2006, for example, CLEC access lines in Iowa increased from 193,000 to 260,000. But, in the meantime, other competitors for local residential and business service entered the marketplace—cable telephony, voice over internet protocol (VOIP), and wireless service. While the record here does not detail the actual inroads made by each of these competitors on traditional landline service, it is clear that a number of Iowans have swapped their ILEC service for one of these three alternatives. From 2000 to 2006, ILEC access lines declined from 1,759,000 to 1,422,000—a greater decline than the corresponding increase in CLEC lines.

As Iowans know from their personal experience, the wireless industry has grown significantly in recent years. From 2000 to 2006, the number of wireless service subscriptions in Iowa increased from 975,000 to 1,821,000. A wireless phone is essentially a two-way radio. Wireless communication is based on radio signals as it travels from the handset to the cell tower (or vice versa). After reaching the cell tower, the signal travels by high-speed data circuit[1] to a mobile switching office (MSO). The wireless provider's MSO uses switches to route calls; those switches, however, may contain additional functionality that an ILEC's switches do not need to have. From the MSO, the communication may travel on the ILEC's network—and will definitely do so if the person being spoken to is an ILEC customer.

---

[1]Wireless providers do not generally own these data lines but lease them from ILECs or CLECs.

Historically, Iowa has centrally (i.e., at the state level) assessed for property tax purposes both the real and the personal property of traditional telephone companies such as Northwestern Bell and its successors U S West and Qwest. This system dates back approximately a century and continues to this day. *See* Iowa Code § 1330 (1913) ("Said assessment shall include all property of every kind and character whatsoever, real, personal, or mixed, used by said companies in the transaction of telegraph and telephone business . . . ."); *id.* § 433.4 (2013) (containing similar language). Thus, ILECs are required to pay property tax in Iowa on the switches, computers, and other equipment and personal property they use to provide local telephone service in Iowa. Historically, this tax regime applied to "[e]very telegraph and telephone company operating a line in this state." *See id.* § 1328 (1913) (current version at *id.* § 433.1 (2013)).

As we noted in *Heritage Cablevision v. Marion County Board of Supervisors*, "In times past Iowa statutes provided for an extensive personal property tax." 436 N.W.2d 37, 37 (Iowa 1989). However: "In 1973 the general assembly adopted a scheme under which most personal property would no longer be taxed." *Heritage Cablevision*, 436 N.W.2d at 37; *see also* 1973 Iowa Acts ch. 255, § 1 (codified as Iowa Code § 427A.11 (1975)) (phasing out personal property tax). Yet this phaseout did not apply to telephone companies and certain other enterprises. *See* Iowa Code § 427A.1(1)(*h*) (2013) (indicating that "[p]roperty assessed by the department of revenue pursuant to sections 428.24 to 428.29, or chapters 433, 434, 437, 437A, and 438" shall be assessed as real property). Northwestern Bell, GTE, and other telephone companies continued to have to pay property tax on their switches, computers, and other equipment and personal property in Iowa. Nonetheless, as Qwest's

counsel acknowledged at oral argument in this case, so long as the telephone company remained subject to rate-base/rate-of-return regulation, it was allowed to include those tax obligations in its rate base and, thus, ultimately to pass them along to Iowa consumers.

House File 518 in 1995 provided that "competitive long distance telephone compan[ies]" (CLDTCs) would *not* be subject to this property taxation scheme. *See* 1995 Iowa Acts ch. 199, § 1 (current version at Iowa Code § 476.1D(10)(*b*)). Instead, such companies essentially would be taxed on their real property only for property acquired after January 1, 1996. Iowa Code § 476.1D(10)(*b*). A "competitive long distance telephone company" was defined as one where "more than half of the company's revenues from its Iowa intrastate telecommunications services and facilities are received from services and facilities that the board has determined to be subject to effective competition." *Id.* § 476.1D(10)(*a*). It is undisputed that this provision was intended to encourage so-called "facilities-based competition," that is, the deployment of additional equipment in Iowa by competitive carriers. Seven carriers have since qualified for CLDTC status, including MCI, AT&T, Sprint, McLeod, and a long-distance affiliate of Qwest.[2]

Wireless companies have never been subject to the property taxation scheme for ILECs because they are not considered to be "telegraph and telephone compan[ies] operating a line in this state." *See id.* § 433.1. Wireless companies are assessed locally (i.e., by the county) for the value of their cell towers, which are a form of real property. *See*

---

[2]A CLDTC for section 476.1D(10) purposes can be a CLEC (like McLeod), but it cannot be an ILEC. *See* Iowa Code § 476.1D(10)(*b*) (stating that a long distance telephone company for purposes of the section "means an entity that provides telephone service and facilities between local exchanges, but does not include . . . a local exchange utility holding a certificate issued under section 476.29, subsection 12").

*id.* § 441.21; Iowa Admin. Code r. 701—71.15. However, they do not pay property tax in Iowa on switches and other equipment or personal property that may be located in their MSOs. It is undisputed, however, that wireless companies frequently have only one MSO for the entire state—rather than a number of central offices per metropolitan area like an ILEC.

Although both CLEC service and other forms of telephone service have made significant incursions into ILEC market share, Qwest continues to have a large share of local phone service. As of December 2007, it still had 730,166 access lines in Iowa. Within its service territory, it had seventy-eight percent of the wireline connections; in over 100 communities, it had at least ninety percent of wireline customers. While some customers had "cut the cord" and substituted wireless for wireline service, the record indicates that in the Midwest region as a whole this would have been only about 15.8% of households as of the second half of 2007. Certain demographic and geographic factors suggested the number would be even lower in Iowa.

Qwest's taxable personal property in Iowa includes a substantial amount of property (perhaps thirty-five to forty-five percent) that was acquired while Qwest was still subject to rate-base/rate-of-return regulation. On November 3, 2006, the Iowa Department of Revenue issued a notice of assessment to Qwest placing a value on its Iowa operating property of $1,028,480,000. Qwest elected to challenge the general assembly's previous decision to tax the personal property of ILECs but not CLDTCs or wireless providers operating in Iowa. Thus, Qwest responded to the 2006 assessment by filing a protest appealing the assessment to the Iowa State Board of Tax Review.

On December 11, Qwest filed an amended protest acknowledging an agreement between the parties which reduced the total assessed value of Qwest's property to $785,000,000, while preserving Qwest's constitutional arguments. Qwest took the position that the dissimilar tax treatment it received in comparison to other similarly situated telecommunications companies amounted to unconstitutional discrimination.[3] Specifically, Qwest argued that the tax scheme which taxed ILECs for the value of their personal property, but not CLDTCs and wireless providers, violated Qwest's rights under the Equal Protection Clauses of the Iowa and United States Constitutions.

The parties jointly requested transfer of the case to the Department of Inspections and Appeals (DIA) for a contested case hearing. Subsequently, an evidentiary hearing was held before the DIA over a five-day period from June 23 to 26 and July 1, 2008. The administrative law judge (ALJ) issued a forty-page decision on May 5, 2010, setting forth her findings of fact and conclusions of law and rejecting Qwest's equal protection challenge. Regarding the differential treatment of personal property owned by CLDTCs and ILECs, she observed:

> Qwest concedes that the legislature may pass tax laws to stimulate economic development. They argue, however, that the state [cannot] provide incentives to one group and deny them to another related group. As applied here, they contend that the legislature had no legitimate basis for offering a property tax incentive to competitive long distance companies and excluding incumbent local exchange providers.
>
> The record reveals ample justification for the legislature to make a distinction between ILECs and telephone service providers, including the long distance providers. Qwest and other ILECs had been providing local exchange service and

---

[3]The parties stipulated that of this assessment, 28 percent (or $220,049,395) represents assets that were purchased after January 1, 1995, and that would have been exempt if purchased by a CLDTC.

operating as sole providers for their service areas under sanctioned monopoly status for decades. They owned the existing local telephone infrastructure and, prior to the mid-1990s were "the local phone company." ILECs were unlikely to reduce their presence in the state or withhold expansion in Iowa. More importantly, the ILECs were well-positioned not only to withstand competition, but to impede competitors.

. . . .

Qwest contends that the offer of tax incentives to competitive long distance companies was not rationally related to a desire to enhance competition and encourage the construction in the local exchange market. The state had a legitimate interest in encouraging the development and construction of both long distance and local exchange facilities in Iowa. H.F. 518 contained other measures designed to promote competition in the local exchange market. Further, the subsection 476.[1]D(10) exemption applied to all newly acquired equipment purchased by qualifying CLDCs—not merely equipment used to provide long distance service. Thus the exemption provided an incentive for established long distance companies to move into the local exchange market.

Finally, Qwest argues that even if a rational basis existed to support the exemption for newly acquired CLDC property when the provision was enacted in 1995, the growth of competitive forces within the telecommunications industry between 1995 and 2006 has negated the need to provide incentives to encourage competitors. However, the record establishes that although Qwest has lost a portion of its market share, Qwest remains the dominant local exchange carrier in the markets it serves.

The rational basis test does not require classifications to be narrowly tailored to serve a particular end. If the classification has some reasonable basis, it does not offend the constitution simply because the classification is not made with mathematical nicety or because in practice it result[s] in some inequality. The fact that the legislature could have crafted a broader or different tax exemption does not render section 476.1D(10) unconstitutional.

(Internal citations and quotation marks omitted.)

Turning to the wireless providers, the ALJ concluded:

The state also has ample reason to treat wireless service providers differently than wireline providers for purposes of property tax assessment. By definition, wireless providers

are not telephone companies. They do not own an interconnected state-wide infrastructure and their property is not centrally assessed by the department of revenue. Although these distinctions impact the question of whether wireline and wireless providers are similarly situated, they also provide[] a rational justification for taxing wireless companies differently than wireline telephone companies.

Wireless communication service is a relatively new industry. The first commercial license was issued by the FCC in 1983. From the inception of personal wireless service, this segment of the market has been highly competitive. Despite market competition, wireless service has expanded rapidly throughout the state.

. . . Because wireless providers frequently have only one mobile [switching] office for the entire state (rather than a number of central offices within each service area) it seems reasonable to conclude that wireless companies are likely to own significantly less property which would fall into the traditional "personal property" categories than ILECs own.

. . . .

Wireless providers do not own the type of state-wide infrastructure common to centrally assessed businesses. It is fully reasonable for the legislature to allow wireless providers the same personal property tax exemptions that are available to other locally assessed owners of commercial property.

Qwest filed a timely appeal to the Iowa State Board of Tax Review. The parties stipulated, however, that the ALJ's decision would be treated as that of the Board, subject to Qwest's right to seek judicial review thereon. Accordingly, the Board issued a final order on October 12, adopting the ALJ's decision in full.

On November 10, Qwest brought a petition for judicial review in the Polk County District Court, raising only its *state* constitutional challenge. After a hearing, the district court reversed the Board's ruling and found that Qwest's Iowa constitutional rights were violated with respect to the tax treatment it received compared to CLDTCs and wireless providers. With respect to the CLDTCs, the district court found:

Assuming without deciding that at the time [House File 518] was enacted there was a rational basis and legitimate governmental purpose for the legislation, the Court concludes the evidence in the record shows such rationale no longer exists. . . . It has been established that the wireline and wireless segments of the telecommunications industry are in competition for the same customers, thus this is the relevant market to look at. When this more complete picture of the total telephone market is looked at, Qwest's share of the market it served as of 2006 is just under forty percent according to a report by the Board. Therefore, it is clear Qwest is no longer dominant in this market, as it was fifteen years ago when it was operating under sanctioned monopoly status, and the ALJ's reason for rejecting this argument by Qwest is without support in the record.

. . . .

In the end the Court returns to the fact the items taxed or not taxed (here Qwest's switches and related central office equipment and the personal property purchased after 1995 by some long distance telephone companies respectively) are nearly identical and are for the same main activity or primary use. . . .

Assuming without deciding there was a rational basis for the disparate tax treatment of section 476.1D(10) when it was enacted, the Court concludes that rational basis and legitimate governmental interests have been vitiated through changes in the underlying circumstance[s], passage of time, and advancements in technology. Accordingly, Iowa Code section 476.1D(10) allowing tax exemption for personal property acquired after 1995 by CLDCs but taxing the similarly situated "personal" property of Qwest is an unconstitutional violation of Iowa's equal protection provision, set forth in Article 1, section 6 of Iowa's Constitution, as applied to Qwest.

(Internal citations omitted.)

Similarly, concerning wireless providers, the district court wrote:

As with the analysis of long distance companies above, the Court will assume without deciding there was a rational basis for the exemption for wireless companies when it was enacted. However, as above, the Court must again conclude such assumed rational basis no longer exists. Wireless service was a relatively new industry and was not widely available in Iowa when the exemption was enacted. The record is clear the growth of wireless providers and subscribers has exploded over the past ten years to the point

that by 2006 the number of wireless subscribers in Iowa exceeded the number of wireline customers. Accordingly, the Court concludes any rational basis and legitimate governmental interests that once existed for this disparate tax treatment have been vitiated through changes in the underlying circumstance[s], passage of time, and advancements in technology. The provisions in Iowa Code chapters 433 and 427A that establish a tax scheme allowing a tax exemption for the personal property of wireless [providers] but not for the substantially similar switching and central office equipment property of Qwest (the only property relevant to this issue as detailed above) are in violation of Iowa's equal protection provision, set forth in Article 1, section 6 of Iowa's Constitution, as applied to Qwest.

The Board timely appealed to this Court.

## II. Standard of Review.

We generally review a district court's decision on a petition for judicial review of agency action for correction of errors at law. *Timberland Partners XXI, LLP v. Iowa Dep't of Revenue*, 757 N.W.2d 172, 174 (Iowa 2008). However, in cases such as this, where constitutional issues are raised, our review is de novo. *Id.*

## III. Analysis.

**A. Equal Protection Under the Iowa Constitution**. We now address Qwest's claim that the State's property tax scheme for telecommunications companies violates the equal protection clause of the Iowa Constitution.[4] Article I, section 6 of the Iowa Constitution states: "All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens,

---

[4]For the sake of consistency with our more recent precedent, we will refer to article I, section 6 as the "equal protection clause" of the Iowa Constitution. *See L.F. Noll Inc. v. Eviglo*, 816 N.W.2d 391, 392 (Iowa 2012) (referring to the "equal protection clause" of the Iowa Constitution); *NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 44 (Iowa 2012) (referring to the "equal protection provision found in article I, section 6 of the Iowa Constitution"); *King v. State*, 818 N.W.2d 1, 22 n.18 (Iowa 2012); *Judicial Branch v. Iowa Dist. Ct.*, 800 N.W.2d 569, 578 (Iowa 2011) (querying whether "the Equal Protection Clause of the Iowa Constitution has been violated"); *Rojas v. Pine Ridge Farms, L.L.C.*, 779 N.W.2d 223, 229 (Iowa 2010) (same).

privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Like its federal counterpart, our equal protection clause "is essentially a direction that all persons similarly situated should be treated alike." *Varnum v. Brien*, 763 N.W.2d 862, 878 (Iowa 2009) (citation and internal quotation marks omitted); *accord Judicial Branch v. Iowa Dist. Ct.*, 800 N.W.2d 569, 578 (Iowa 2011).

Social and economic legislation, such as the tax provisions at issue here, is reviewed under the rational basis test. *See King v. State*, 818 N.W.2d 1, 27 (Iowa 2012); *accord Sanchez v. State*, 692 N.W.2d 812, 817 (Iowa 2005). This is "a very deferential standard." *Varnum*, 763 N.W.2d at 879; *accord King*, 818 N.W.2d at 27; *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 259 (Iowa 2007). "Under rational-basis review, the statute need only be rationally related to a legitimate state interest." *Sanchez*, 692 N.W.2d at 817–18. "[T]he [s]tate does not have to produce evidence, and only a plausible justification is required." *King*, 818 N.W.2d at 28; *see also Varnum*, 763 N.W.2d at 879. The challenging party "has the heavy burden of showing the statute unconstitutional and must negate every reasonable basis upon which the classification may be sustained." *Varnum*, 763 N.W.2d at 879 (citation and internal quotation marks omitted); *accord King*, 818 N.W.2d at 28; *Sperfslage v. Ames City Bd. of Review*, 480 N.W.2d 47, 49 (Iowa 1992) ("The statute will . . . be upheld under the rational basis standard if we find the legislature could reasonably conclude that the classification would promote a legitimate state interest."). The fit between the means and the end can be "far from perfect" so long as the relationship "is not so attenuated as to render the distinction arbitrary or irrational." *Varnum*, 763 N.W.2d at 879 & n.7 (citation and internal quotation marks omitted); *see also King*, 818 N.W.2d at 28.

When we have applied the rational basis test to tax laws, they have generally been upheld without much difficulty. "The rational basis standard is easily met in challenges to tax statutes." *Hearst Corp. v. Iowa Dep't of Revenue & Fin.*, 461 N.W.2d 295, 306 (Iowa 1990); *accord Heritage Cablevision*, 436 N.W.2d at 38 ("It is widely recognized that the rational basis standard is easily satisfied in challenges to tax statutes."); *City of Waterloo v. Selden*, 251 N.W.2d 506, 508–09 (Iowa 1977) ("An iron rule of equal taxation is neither attainable nor necessary.").[5] In *Hearst,* we held that it violated neither federal nor state equal protection guarantees for the legislature to exempt newspapers but not magazines from Iowa's sales and use tax. 461 N.W.2d at 304–06. We noted that "in tax matters even more than in other fields, the legislature possesses the greatest freedom in classification." *Hearst*, 461 N.W.2d at 305. Among other things, we accepted the state's argument that Iowa's tax scheme served the state's interest in "enhancing the general knowledge and literacy of its citizenry." *Id.* at 306.

> By subsidizing the price of newspapers through the "newspaper" exemption the State makes newspapers available to those of even moderate to low means; an action deemed to be in the public interest. With this exemption, newspapers will remain an inexpensive source of public information which most people will be able to afford.

*Id.* It went without saying that the exemption applied regardless of whether the buyer of the newspaper was a person of moderate to low means and did *not* apply even if the magazine would have been a

---

[5]The United States Supreme Court has taken a similar view. *See Armour v. City of Indianapolis*, ___ U.S. ___, ___, 132 S. Ct. 2073, 2080, 182 L. Ed. 2d 998, 1005 (2012) ("[W]e have repeatedly pointed out that [l]egislatures have especially broad latitude in creating classifications and distinctions in tax statutes." (Citation and internal quotation marks omitted.)).

similarly inexpensive source of public information for people of moderate to low means.

Similarly, in *Sperfslage*, we upheld a state regulation that required all buildings with three or more living units to be classified as commercial properties for property taxation purposes while allowing all buildings with one or two units to be classified as residential even when used as a commercial venture. 480 N.W.2d at 48–49. We reiterated that the rational basis test "is easily satisfied in challenges to tax statutes." *Sperfslage*, 480 N.W.2d at 49. We then found the regulation constitutional because it was "far more likely that an owner occupier would purchase one-unit or two-unit rental properties than three-unit property for use as a residence." *Id.* Again, this rough correspondence between the asserted state interest and the classification was enough. It did not matter that in a particular case, the single or double-unit property never had a residential purpose.

And in *Home Builders Ass'n of Greater Des Moines v. City of West Des Moines*, we rejected a federal constitutional challenge to a parks fee imposed on residential but not commercial developers, and based on the geographic size of the parcel, without regard to the anticipated density of the proposed subdivision. 644 N.W.2d 339, 352–53 (Iowa 2002). We noted that the city had "the freedom in economic matters to encourage one type of property usage over another by differentiating the fees imposed on different usages" and was "free to encourage commercial development by relieving it from payment of the parks fee." *Home Builders*, 644 N.W.2d at 352–53. We added that the City "may reasonably assume that commercial users of property generate less need for park facilities than do residential developers." *Id.* at 353.

In *Racing Ass'n of Central Iowa v. Fitzgerald* (*RACI II*), following remand from the United States Supreme Court, we concluded that the legislature's decision to tax racetrack gross gambling receipts at a rate of thirty-six percent and riverboat gross gambling receipts at a rate of twenty percent violated article I, section 6 of the Iowa Constitution. 675 N.W.2d 1, 15–16 (Iowa 2004).[6] We explained our application of the rational basis standard in the following terms:

> [T]his court must first determine whether the Iowa legislature had a valid reason to treat racetracks differently from riverboats when taxing the gambling revenue of these businesses. *See Fitzgerald v. [Racing Ass'n of Cent. Iowa,* 539 U.S. 103, 107, 123 S. Ct. 2156, 2159, 156 L. Ed. 2d 97, 103 (2003)] (requiring " 'a plausible policy reason for the classification' " (citation omitted)). In this regard, "the statute must serve a legitimate governmental interest." *Glowacki v. State Bd. of Med. Exam'rs,* 501 N.W.2d 539, 541 (Iowa 1993). Moreover, the claimed state interest must be "*realistically* conceivable." *Miller v. [Boone Cnty. Hosp.,* 394 N.W.2d 776, 779 (Iowa 1986)] (emphasis added). Our court must then decide whether this reason has a basis in fact. *See Fitzgerald,* 539 U.S. at [107], 123 S. Ct. at 2159, 156 L. Ed. 2d at 103 (requiring that legislature could rationally believe facts upon which classification was based are true). Finally, we must consider whether the relationship between the classification, i.e., the differences between racetracks and excursion boats, and the purpose of the classification is so weak that the classification must be viewed as arbitrary. *See id.* (requiring that " 'the relationship of the classification to its goal [not be] so attenuated as to render the distinction arbitrary or irrational' " (citation omitted)); *accord Chicago Title Ins. Co. v. Huff,* 256 N.W.2d 17, 29 (Iowa 1977) (requiring rational relationship between classification and a legitimate state purpose or governmental interest).

*RACI II,* 675 N.W.2d at 7–8 (footnotes omitted).

---

[6]*RACI II* was the last decision in a series. We had originally struck down the tax differential in 2002 as violating both the Federal and Iowa Equal Protection Clauses, without performing a separate analysis under the Iowa Constitution. *Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI I),* 648 N.W.2d 555, 562 (Iowa 2002). The United States Supreme Court then granted certiorari, reversed our ruling that the tax scheme violated federal equal protection, and remanded to us for further proceedings. *Fitzgerald v. Racing Ass'n of Cent. Iowa,* 539 U.S. 103, 110, 123 S. Ct. 2156, 2161, 156 L. Ed. 2d 97, 105 (2003). This led to our 2004 decision in *RACI II* under the Iowa Constitution alone.

In two separate footnotes, we elaborated on what we meant by the phrases "realistically conceivable" and "basis in fact." With respect to the former, we said:

> The requirement of " 'a *plausible* policy reason for the classification' " may be the aspect of equal protection analysis most susceptible to differing conclusions in application. *See generally Fitzgerald,* 539 U.S. at [107], 123 S. Ct. at 2159, 156 L. Ed. 2d at 103 (emphasis added) (citation omitted) (stating requirements of Equal Protection Clause). The dictionary gives two synonyms for the word "plausible": "specious" and "credible." *Webster's Third New International Dictionary* 1736 (unabr. ed. 2002). Certainly a "specious" reason should not pass constitutional muster. *See generally id.* at 2187 (defining "specious" in relevant part as "apparently right or proper: superficially fair, just or correct but not so in reality: appearing well at first view: PLAUSIBLE"). Rather, the policy reason justifying a particular classification should be "credible." *See generally id.* at 532 (defining "credible" as "capable of being credited or believed: worthy of belief . . . : entitled to confidence: TRUSTWORTHY"). Our court's statement in *Miller* that the reason offered in support of a classification must be "*realistically* conceivable" reflects the latter understanding of a "plausible" reason. 394 N.W.2d at 779 (emphasis added). It implicitly rejects a purely superficial analysis and implies that the court is permitted "to probe to determine if the constitutional requirement of some rationality in the nature of the class singled out has been met." *Greenwalt v. Ram Restaurant Corp.,* 71 P.3d 717, 730–31 (Wyo. 2003) (considering validity of statutory classification under the equal protection guarantees of the United States and Wyoming constitutions).

*Id.* at 7 n.3. Concerning the latter, we stated:

> Although this element of equal protection analysis does not require "proof" in the traditional sense, it does indicate that the court will undertake some examination of the credibility of the asserted factual basis for the challenged classification rather than simply accepting it at face value.

*Id.* at 8 n.4. Thus, we made clear that actual proof of an asserted justification was not necessary, but the court would not simply accept it at face value and would examine it to determine whether it was credible as opposed to specious.

We also reiterated that a party bringing a rational basis challenge must "negat[e] every reasonable basis that might support the disparate treatment." *Id.* at 8. Yet we added that when "a classification involves extreme degrees of overinclusion and underinclusion in relation to any particular goal, it cannot be said to reasonably further that goal." *Id.* at 10 (citation and internal quotation marks omitted).

Applying these standards, we rejected four asserted justifications in *RACI II* for the disparate taxation—promoting economic development of river communities, protecting the reliance interests of riverboat operators, aiding the financial positions of the riverboats, and maintaining riverboats in Iowa. *Id.* at 9–15. Concerning the first asserted state interest, we noted that there were river communities with racetracks and nonriver communities with riverboats. *Id.* at 10. Thus, the justification was "illogical." *Id.* It involved "extreme degrees of overinclusion and underinclusion." *Id.* (quoting *Bierkamp v. Rogers*, 293 N.W.2d 577, 584 (Iowa 1980)). We then rejected the asserted reliance interest of riverboat operators because the taxation lines drawn had nothing to do with the time of investment. *Id.* at 11. "[T]he differential tax is triggered not by whether the business engaged in gambling prior to the implementation of the new tax rates, but [by] whether the gambling takes place on a floating casino." *Id.* at 12.

We also concluded that aiding the financial position of riverboats was an insufficient justification by itself. If that were so, "*any* differential tax would be constitutional because a lower tax *always* benefits the financial situation of the taxpayer subject to the lower rate." *Id.* at 13. Finally, we could not accept the State's contention that a thirty-six percent tax on gross gambling receipts of racetracks (much higher than the tax rate recommended by the legislative study committee) was

designed as an incentive to keep *riverboats* in Iowa. *Id.* at 15. As we put it, "[T]he legislature could not reasonably have believed that taxing racetracks at thirty-six percent rather than at the twenty-four percent rate recommended by the committee would have any impact on the competitive position of the excursion boats vis-à-vis their out-of-state counterparts." *Id.* "There [wa]s simply no rational connection between this conceivable legislative purpose and the discriminatory tax rate imposed on the racetracks." *Id.*

With the preceding principles in mind, we now turn to the personal property tax scheme at issue in this case.

**B. Application of Rational Basis Review to Qwest's Claims.** The State vigorously argues that Qwest is not "similarly situated" with the CLDTCs and wireless providers. Therefore, the State initially contends, we do not need to reach the question of whether the more favorable tax treatment of CLDTC and wireless provider personal property has a rational basis. *See Timberland*, 757 N.W.2d at 175 ("If . . . the court is unable to identify[] a class of similarly situated individuals who are allegedly treated differently under the challenged statute, the plaintiff has not satisfied the first step of an equal protection analysis, and the court need not address whether the statute has a rational relationship to a legitimate government interest." (Citation and internal quotation marks omitted.)). There is some risk of succumbing to a tautology if we decide an equal protection claim on this ground, however. *Varnum*, 763 N.W.2d at 882–83. No two groups are identical in every way, and "nearly every equal protection claim could be run aground onto the shoals of a threshold analysis if the two groups needed to be a mirror image of one another." *Id.* at 883. We will assume, therefore, that the groups are similarly situated here.

Nonetheless, we agree with the Board's conclusion that a rational basis exists for the legislature's decision not to tax the post-January 1, 1995 investments by CLDTCs in personal property in this state. This was a reasonable way for the legislature to encourage the deployment of new infrastructure that would foster competitive wireline networks and result in lower prices for consumers. The legislature could have rationally believed that the ILECs had a powerful built-in competitive advantage based on their existing facilities, whose development had been underwritten by Iowa ratepayers over the past century.

The district court assumed for the sake of argument that section 476.1D(10)'s tax exemption may have served a rational purpose in 1995, but found that it does not do so now because Qwest "is no longer dominant." We have said before that "when applying a rational basis test under the Iowa Constitution, changes in the underlying circumstances can allow us to find a statute no longer rationally relates to a legitimate government purpose." *State v. Groves*, 742 N.W.2d 90, 93 (Iowa 2007) (citing *Bierkamp*, 293 N.W.2d at 581).[7]

---

[7]Neither of these cases involved a tax exemption. In *Groves*, we considered a substantive due process challenge to a statute prohibiting sex offenders from residing within two thousand feet of a school or a child care facility. 742 N.W.2d at 92. We noted that two years before, both our court and the Eighth Circuit had rejected similar constitutional challenges to these residency restrictions. *Id.* at 93 (citing *State v. Seering*, 701 N.W.2d 655, 662–65 (Iowa 2005), and *Doe v. Miller*, 405 F.3d 700, 709–16 (8th Cir. 2005)). Citing *Bierkamp*, we said that "changes in the underlying circumstances can allow us to find a statute no longer rationally relates to a legitimate government purpose." *Id.* (citing *Bierkamp*, 293 N.W.2d at 581). But we noted that Groves had "failed to present any evidence that would cause us to retreat from our decision in *Seering*." *Id.* Thus, we rejected his rational basis challenge. *Id.*

In *Bierkamp*, we found no rational basis for Iowa's automobile guest statute and held it could not withstand constitutional attack under article I, section 6. 293 N.W.2d at 585. At the outset of our rational basis review, we stated that "changes in underlying circumstances may vitiate any rational basis" and "the passage of time may call for a less deferential standard of review as the experimental or trial nature of legislation is less evident." *Id.* at 581. However, it is unclear that we even applied these principles in that case. Immediately after stating them, we went on to discuss jurisprudence overturning automobile guest statutes in other jurisdictions. *Id.* at 581–82. Thus, if

However, in this case, we disagree with the district court's conclusion. To find that Qwest "is no longer dominant," the district court considered Qwest's percentage of total wireline *and wireless connections*. But this assumes that wireless and wireline are substitutes, when the record before the Board showed that most wireless customers (eighty-five percent or more during the time period covered by this proceeding) continue to pay for wireline service. Thus, one can plausibly argue that there remains a distinct demand and, therefore, a separate market for wireline service, and that Qwest is still dominant in *that* market. *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469–82, 112 S. Ct. 2072, 2083–90, 119 L. Ed. 2d 265, 285–94 (1992) (finding that the existence of cross-elasticity of demand does not prevent product markets from being treated as separate for antitrust purposes). For rational basis purposes, this "realistically conceivable" justification, which does not involve "extreme degrees of overinclusion and underinclusion," is a sufficient basis to uphold the legislature's line-drawing. *RACI II*, 675 N.W.2d at 10.

Additionally, to the extent there is a separate market for wireline services in which the ILECs have monopoly power, a legislature could

anything, the *Bierkamp* decision's reference to "changes in underlying circumstances" contemplates evolving *legal* trends. There have been no comparable developments of which we are aware in property tax jurisprudence.

Notably, the Eighth Circuit case on which we relied in *Groves* indicates that elected policymakers are better suited to reevaluate the basis for legislation over time. *See Doe*, 405 F.3d at 715 ("The legislature is institutionally equipped to weigh the benefits and burdens of [legislation], and to reconsider its initial decision in light of experience and data accumulated over time."). Still, the United States Supreme Court recognized that a property taxation scheme can become constitutionally invalid if it fails to account for changes in value due to the passage of time. *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty.*, 488 U.S. 336, 343–46, 109 S. Ct. 633, 637–39, 102 L. Ed. 2d 688, 697 (1989) (striking down a county's assessment of property taxes primarily on the basis of purchase price, with no adjustments over time, such that new property owners were assessed at roughly 8 to 35 times the rate of those who had owned their property longer).

reasonably conclude that taxing the ILECs' personal property is an appropriate way to capture some of their monopoly rent. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 319–20, 113 S. Ct. 2096, 2104, 124 L. Ed. 2d 211, 225 (1993) (justifying a regulatory exemption for satellite service covering commonly owned or managed buildings, but not separately owned and managed buildings, on the ground that an operator in the latter situation is more likely to have unchecked monopoly power).[8]

Turning to the differential treatment of personal property owned by ILECs and wireless providers, we note at first the district court's irrefutable observation: "[T]he growth of wireless providers and subscribers has exploded over the past ten years to the point that by 2006 the number of wireless subscribers in Iowa exceeded the number of wireline customers."[9] Yet, this observation is helpful only in so far as it goes. To the extent that separate wireless and wireline markets exist, the legislature could reasonably conclude that the wireless market is competitive, with four companies of national scope doing business in

---

[8]The issue here is one of tax *incidence*, i.e., whether the tax would be borne by consumers or instead would come out of monopoly profits. Defending a tax on this basis is different from defending it based on "revenue production" or "the pure fact that the market will allow [a higher tax]." *See RACI I*, 648 N.W.2d 561–62. In short, it is one thing for the government to assert that a group of taxpayers should be more heavily taxed so the government can raise more money. As we pointed out in *RACI I*, this is a circular argument that can always be used to justify *any* discrepancy in tax rates. However, it is another thing to maintain that differential tax rates are rationally related to enhancing affordability because the lower rates will ultimately benefit consumers while the higher rates will come out of monopoly rents.

[9]Qwest argues that when the legislature phased out personal property taxes on most businesses in 1973, it could not have been intending to stimulate the wireless industry, which did not even exist. But one cannot have it both ways. If we are going to require that legislation serve a *current* legitimate purpose, we cannot require that such end have been in the actual minds of legislators when the legislation was enacted. Otherwise, we would be saying that the legislature has to periodically review the entire Iowa Code and regularly reenact any laws that serve a different purpose than the original intended purpose.

Iowa (AT&T, Verizon, Sprint and T-Mobile), and that the wireline market is not. In a competitive industry, pricing approaches marginal cost, and there are no monopoly rents for government to extract. *See NetCoalition v. S.E.C.*, 615 F.3d 525, 537 (D.C. Cir. 2010) ("[I]n a competitive market, the price of a product is supposed to approach its marginal cost, *i.e.*, the seller's cost of producing one additional unit."). Thus, the legislature might logically conclude that the burdens of a tax on the wireless providers' personal property in Iowa would simply be passed along to consumers in higher prices, while, a tax on a monopolist would not.

The record contains evidence from which a rational legislator might conclude that the wireless companies operate in a competitive market and Qwest still does not. Wireless rates have been declining dramatically on a per minute basis. Meanwhile, Qwest increased single line flat-rated residential monthly service rates from $12.80 to $14.12 on August 1, 2005, to $15.56 on August 1, 2006, and to $16.60 on August 1, 2007.[10] Thus, the justification for differential treatment is not "specious"; it is "credible." *RACI II*, 675 N.W.2d at 8 n.3.

It is useful to compare and contrast this case with *RACI II*. A key weakness of the State's position in *RACI II* was that it was trying (at least in part) to justify the tax differential simply as a way to promote the companies that were treated favorably by the differential. We do not hold here that the State can simply justify the different tax treatment of ILECs in section 433.4 as a way to promote one group of companies over

---

[10]Qwest's ability to institute annual price increases of eight to ten percent suggests that competition is not so "robust" as Qwest claims it be, or at least the legislature could so conclude. Qwest analogizes its situation to Blockbuster, which used to have a thriving in-store rental business but has been driven into bankruptcy by other forms of video competition. Yet, Qwest has not been driven into bankruptcy and does not claim that its wireline business in Iowa is unprofitable. Nor has Qwest demonstrated, as the racetracks did in *RACI*, that the tax in question jeopardizes its ability to make a profit. *RACI I,* 648 N.W.2d at 561.

another—and it hasn't. Rather, the State has made a plausible showing that the ILECs retain some vestiges of their former monopoly status that make it appropriate for the State to tax their property while relieving potential developers of competing infrastructure from a similar burden.

Also, we dismissed the reliance interest in *RACI II* because nothing in those laws turned on when the investment had been made. By contrast, section 476.1D(10) limits the CLDTC exemption to property purchased after the exemption was enacted. Furthermore, this case concerns property taxes, an area where reliance interests have been viewed as significant. Owners—certainly sophisticated businesses like telecommunications companies—often consider the property tax consequences of their purchases before they make them. It is reasonable for the State to preserve those reliance interests by continuing to tax property as it has been taxed from the date of purchase by its owner. *See Nordlinger v. Hahn*, 505 U.S. 1, 13–14, 112 S. Ct. 2326, 2333, 120 L. Ed. 2d 1, 14 (1992) (upholding California's limits on adjustments to the assessed value of property until it is resold and acknowledging that "classifications serving to protect legitimate expectation and reliance interests do not deny equal protection of the laws").

Qwest's challenge to Iowa's personal property tax scheme is not the only such challenge that has been brought nationally. In *Verizon New Jersey Inc. v. Hopewell Borough*, an ILEC objected to a New Jersey law that imposed a personal property tax on any "local exchange telephone company," which the law defined as "a telecommunications carrier providing dial tone and access to fifty-one percent of a local telephone exchange." 26 N.J. Tax 400, 404 (N.J. Tax Ct. 2012). The court construed the statute as requiring an annual determination of whether the ILEC still had 51% of *wireline* service, in which case the personal

property tax would continue. *Verizon*, 26 N.J. Tax at 418. The New Jersey court then held that the statute so construed did not violate the equal protection clause of the New Jersey Constitution:

> The court concludes that there was a rational basis to continue to impose the personal property tax only on those local telephone companies that had, for many years, enjoyed a monopoly over the provision of local telephone service in their franchise areas. The Legislature could reasonably assume that the three ILECs enjoyed a substantial competitive advantage as a result of their former monopolies; that they continued to be the dominant users of public rights of way and facilities; and that, as a transitional measure, it was reasonable to continue to impose the tax on only those companies until such time as they no longer enjoyed a competitive advantage, as evidenced by the fact that they were no longer providing 51% of the dial tone and access to an exchange.

*Id.* at 428. The court added in dictum that the tax would fail the rational basis test if companies that had originally met the fifty-one percent would "perpetually be subject to tax" regardless of what happened to their competitive position. *Id.* Notably, though, New Jersey employs a balancing test in rational basis cases that differs analytically from the federal rational basis test. *Id.* at 425. In any event, the New Jersey court found that the ILECs' retention of a majority of the wireline business was a sufficient constitutional justification for continuing to treat them differently, the same conclusion we are reaching here. *See also Qwest Corp. v. Colo. Div. of Prop. Taxation*, ___ P.3d ___, No. 10CA1320, 2011 WL 3332876 (Colo. App. 2011) (rejecting Qwest's constitutional arguments that "its property must receive the same tax benefits as similar property used by cable companies to provide telephone services"), *cert. granted*, No. 11SC669, 2012 WL 1940812 (Colo. 2012); *GTE North, Inc. v. Zaino*, 770 N.E.2d 65, 69 (Ohio 2002) (rejecting an ILEC's constitutional challenge to an Ohio law that provided for a much higher

rate of assessment on certain personal property of ILECs and noting that ILECs "enjoy the advantage . . . of being the default provider of intraLATA call service for customers who fail to take affirmative action to choose another provider"); *Sw. Bell Tel. Co. v. Combs*, 270 S.W.3d 249, 272–73 (Tex. App. 2008) (finding no federal or state equal protection violation in imposing franchise taxes on local exchange carriers but not long-distance carriers).[11]

**C. Alternative to the Rational Basis Test.** In the alternative, Qwest urges us not to follow our established rational basis jurisprudence, but instead to take up the lead of certain other states that expressly require uniformity in taxation. Qwest points out that a few other jurisdictions have concluded that "constitutional uniformity is sufficiently important that no rationalization can justify differences in taxation." *See Citizens Telecomms. Co. of the White Mountains v. Ariz. Dep't of Revenue,* 75 P.3d 123, 129–30 (Ariz. Ct. App. 2003) (holding that under the Arizona constitution functionally equivalent property must be taxed the same); *Idaho Tel. Co. v. Baird*, 423 P.2d 337, 346–47 (Idaho 1967) (finding it unconstitutional under Idaho's uniformity clause to assess certain property at a higher ratio of full cash value), *overruled by Simmons v. Idaho St. Tax Comm'n,* 723 P.2d 887, 892–93 (Idaho 1986); *Inter Island Tel. Co., v. San Juan County*, 883 P.2d 1380, 1382–83 (Wash. 1994) (holding it unconstitutional to assess a local phone company at a much higher rate than other utilities and personal property taxpayers).

These cases are easily distinguishable, however, because the state constitutions at issue contained specific language requiring uniformity in

---

[11]The State also argues that Qwest's greater use of government services because of its much larger infrastructure in Iowa justifies imposing personal property tax on it, but not on the CLDTCs and wireless providers. We need not reach that argument.

taxation. *Idaho Telephone* relied on language in article VII, section 5 of the Idaho Constitution stating, "All taxes shall be uniform upon the same class of subjects within the territorial limits, of the authority levying the tax . . . ." 423 P.2d at 340. In any event, that Idaho decision has been overruled. *See Simmons*, 723 P.2d at 892–93. The Arizona and Washington courts also relied on similar state constitutional provisions apparently mandating uniform taxation. *See Citizens Telecomms. Co.*, 75 P.3d at 129 ("According to the Uniformity Clause of the Arizona Constitution, Article 9, Section 1, 'all taxes shall be uniform upon the same class of property.' "); *Inter Island*, 883 P.2d at 1382 ("All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax . . . ." (quoting Wash. Const. art. 7, § 1)).

Needless to say, the Iowa Constitution does not contain such a clause. And, such a test would be antithetical to our precedents as we have described them above. *Cf. City of Coralville v. Iowa Utils. Bd.*, 750 N.W.2d 523, 530 n.3 (Iowa 2008) (declining to interpret the Iowa Constitution as requiring that "all Iowa laws be *geographically* uniform").

### IV. Conclusion.

For the foregoing reasons, we reverse the judgment of the district court and remand to that court for further proceedings not inconsistent with this opinion.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Waterman, J., who concurs specially and Appel, J., who takes no part.

#11–1543, *Qwest Corp. v. Iowa State Bd. of Tax Review*

**WATERMAN, Justice (concurring specially).**

I concur in the majority's well-reasoned decision in all respects but one. The majority misses the opportunity to expressly overrule *Racing Ass'n of Central Iowa v. Fitzgerald (RACI II),* 675 N.W.2d 1 (Iowa 2004). I reiterate my call to expressly overrule *RACI II* as plainly erroneous for the reasons set forth in my special concurrence in *King v. State,* 818 N.W.2d 1, 43 n.28 (Iowa 2012) (Waterman, J., concurring).