# IN THE SUPREME COURT OF IOWA

No. 14–0494

Filed April 10, 2015

**LSCP, LLLP,**

    Appellant,

vs.

**COURTNEY M. KAY-DECKER,** Director, **IOWA DEPARTMENT OF REVENUE,**

    Appellee.

---

Appeal from the Iowa District Court for Polk County, Rebecca Goodgame Ebinger, Judge.

An ethanol producer appeals after the Iowa Department of Revenue and the district court both concluded Iowa's excise tax on natural gas delivery is constitutional. **AFFIRMED.**

Christopher E. James and William E. Hanigan of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Donald D. Stanley Jr., Special Assistant Attorney General, and James D. Miller, Assistant Attorney General, for appellee.

**HECHT, Justice.**

Iowa taxes the delivery of natural gas at variable tax rates depending on volume and the taxpayer's geographic location within the state. In this appeal, we confront several constitutional challenges to that statutory framework.

## I. Background Facts and Proceedings.

LSCP, LLLP[1] operates an ethanol manufacturing plant near Marcus, Iowa. Operations began in April 2003. The ethanol LSCP manufactures at its Marcus plant is sold primarily through a marketing firm for use as fuel. LSCP also produces several ethanol byproducts, all of which are marketed for use as feed for livestock.

LSCP's manufacturing processes use a substantial volume of natural gas. The gas supplies energy for the plant's steam boilers and is burned to provide ambient heat for the plant in the winter months. The relevant unit of measurement for the natural gas LSCP consumes is a therm. Between 2007 and 2010, LSCP consumed millions of therms of natural gas each year.[2]

There are no natural gas producers in Iowa. Accordingly, all natural gas consumed in the state necessarily comes from out-of-state suppliers through federally regulated interstate pipelines. Most consumers receive their natural gas from a state-regulated local distribution company (LDC). LDCs connect to the interstate pipeline,

---

[1]LSCP is an acronym for Little Sioux Corn Processors.

[2]One therm equals 100,000 British thermal units (Btu). One Btu represents the amount of heat required to raise the temperature of one pound of water by one degree Fahrenheit. U.S. Energy Info. Admin., *Frequently Asked Questions*, http://www.eia.gov/tools/faqs/faq.cfm?id=45&t=8 (last updated Mar. 30, 2015). Because it consumes millions of therms of natural gas per year, LSCP is a very high-volume consumer of natural gas.

redirect the natural gas at a reduced pressure into pipes that are smaller in diameter, and move it to the locations where it is ultimately consumed. In other words, in the delivery of natural gas, the role of an LDC is analogous to the role played by utility companies delivering electricity to consumers. MidAmerican Energy is an example of an LDC.

Some consumers of natural gas bypass LDCs and connect directly to an interstate pipeline. Companies owning interstate pipelines must allow direct connections to any consumer agreeing to certain terms and conditions. *See* 18 C.F.R. § 284.8(a), (e) (2014). Some industrial consumers of natural gas connect directly because they require natural gas service at higher pressures not available from an LDC. Although the record does not reflect whether a need for higher pressure was a reason for LSCP's choice, it is undisputed that LSCP bypassed an LDC and connected directly to an interstate pipeline.

In 1998, five years before LSCP began operations, the legislature restructured the statutes authorizing taxes on electricity and natural gas providers. *See* 1998 Iowa Acts ch. 1194, § 3 (codified at Iowa Code § 437A.2 (1999)). The new framework took effect January 1, 1999. *Id.* § 40. As the district court explained:

> Prior to 1998, natural gas utility companies were taxed on the property they owned in the area the utility serviced—an ad valorem tax. . . . [C]hapter 437A replaced the ad valorem property tax system with an excise tax on the delivery, consumption, or use of natural gas—the "Replacement Tax." Iowa Code § 437A.3(26).

Whereas the former system taxed property, the new system taxes activity. The general assembly expressly intended the new replacement tax scheme to preserve revenue neutrality, approximate the amount of taxes that were paid under the former ad valorem framework, and

"remove tax costs as a factor in a competitive environment." *Id.* § 3; Iowa Code § 437A.2 (2007).

Under the new replacement tax framework, the state is divided into fifty-two natural gas competitive service areas (CSAs). Iowa Code § 437A.3(22). Within each CSA, "[a] replacement delivery tax is imposed on every person who makes a delivery of natural gas to a consumer within th[e] state." *Id.* § 437A.5(1). The statute contains a formula for calculating the amount of replacement tax due. *See id.* The amount of tax is equal to the number of therms a taxpayer delivered into a particular CSA multiplied by the delivery tax rate for that CSA. *Id.* § 437A.5(1)(*a*).

The Iowa Department of Revenue (the Department) calculated each CSA's initial delivery tax rate using a statutorily-prescribed mathematical formula. *See id.* § 437A.5(3). First, the Department calculated average "centrally assessed property tax liability allocated to natural gas service of each taxpayer, other than a municipal utility, principally serving a natural gas [CSA] for the assessment years 1993 through 1997 based on property tax payments made." *Id.* § 437A.5(3)(*a*). The Department next determined "the number of therms of natural gas delivered to consumers which would have been subject to taxation . . . in calendar year 1998" in each CSA had the replacement tax been in effect. *Id.* § 437A.5(3)(*b*). Finally, the initial tax rate was determined by dividing the number computed under subsection (3)(*a*) by the number of therms calculated under subsection (3)(*b*). *See id.* § 437A.5(3)(*c*). With this initial determination as a baseline, any CSA's delivery tax rate can be adjusted each tax year based upon the number of therms delivered within that CSA. *See id.* § 437A.5(1)(*a*), (8).

Typically, the replacement tax applies to LDCs because they remove natural gas from the interstate pipeline and deliver it to consumers. However, LSCP has bypassed an LDC. Thus, section 437A.5(1) does not directly apply to LSCP, because strictly speaking, LSCP does not deliver natural gas; the interstate pipeline does.

Interstate pipeline companies are exempt from the replacement tax. *See id.* § 437A.5(7) (providing the replacement tax in section 437A.5(1) does not apply to natural gas delivered by a pipeline other than those governed by chapter 479); *id.* § 479.2(2) (excluding interstate natural gas pipelines from the definition of "pipeline" under chapter 479). Yet, those who bypass LDCs by directly connecting to an interstate pipeline do not avoid the replacement tax under section 437A.5. Section 437A.5(2) imposes the replacement tax on consumers who directly connect and draw natural gas from an interstate pipeline. *Id.* § 437A.5(2) ("If natural gas is consumed in this state . . . and the delivery, purchase, or transference of such natural gas is not subject to the tax imposed in subsection 1, a tax is imposed on the consumer at the rates prescribed under subsection 1."). Accordingly, because LSCP is a direct-connect consumer and the interstate pipeline company is exempt, LSCP is required to pay the replacement tax on the therms of natural gas it consumes. As the district court noted, the statute essentially "treats a direct-connect consumer as delivering the natural gas to itself."

In 2010, LSCP filed with the Department a claim for a refund of replacement tax LSCP paid for tax years 2007 through 2010, asserting the replacement tax in section 437A.5(2) is unconstitutional because it is based on the CSA in which a taxpayer is located. In particular, LSCP asserted the replacement tax violates the Federal Equal Protection

Clause, article I, section 6 of the Iowa Constitution, and the dormant Commerce Clause.[3]

Chapter 437A establishes a limitations period of three years for taxpayers filing claims for refunds of replacement tax due to clerical or mathematical errors. Iowa Code § 437A.14(1)(*b*). However, the chapter also establishes a shorter limitations period of ninety days for making refund claims based on an assertion the tax is unconstitutional. *Id.* LSCP's claim for refunds filed with the Department contended the shorter limitations period for refund claims based on constitutional grounds violates the Federal Equal Protection Clause and article I, section 6 of the Iowa Constitution. Therefore, LSCP asserted its refund claims were timely filed within the broader three-year limitations period.

An administrative law judge (ALJ) denied LSCP's refund claims and rejected the constitutional challenges to both the refund limitations period and the replacement tax itself. The ALJ reasoned that under both the Federal Equal Protection Clause and article I, section 6 of the Iowa Constitution, any unequal treatment in the statutory framework was supported by a rational basis; that the shorter limitations period for filing refund claims was rationally related to encouraging prompt filing of claims that may impact many other taxpayers; and that the replacement tax framework does not violate the dormant Commerce Clause because it taxes the activity of natural gas delivery without regard to the supplier's location.

---

[3]Initially, LSCP also raised a due process challenge to the replacement tax. The due process challenge is not asserted in this appeal, and we therefore do not address it.

LSCP sought judicial review in the district court. The district court denied each of LSCP's constitutional challenges. LSCP appealed, and we retained the appeal.

## II. Scope of Review.

"We generally review a district court's decision on a petition for judicial review of agency action for correction of errors at law. However, in cases . . . where constitutional issues are raised, our review is de novo." *Qwest Corp. v. Iowa State Bd. of Tax Review*, 829 N.W.2d 550, 557 (Iowa 2013) (citation omitted). This is one such case.

## III. The Parties' Positions.

### A. LSCP.

1. *Equal protection.* LSCP first contends the natural gas replacement tax violates both the Federal Equal Protection Clause and article I, section 6 of the Iowa Constitution. LSCP asserts it is similarly situated to other directly connected ethanol plants within the state, but is taxed at a different rate than other such plants solely because of its geographic location within a particular CSA. *See Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI I)*, 648 N.W.2d 555, 559 (Iowa 2002) (focusing on the main activity being taxed—slot machine gambling—rather than dissimilar scenery surrounding different facilities), *rev'd, Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 110, 123 S. Ct. 2156, 2161, 156 L. Ed. 2d 97, 105 (2003); *see also Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI II)*, 675 N.W.2d 1, 15 (Iowa 2004) ("In the end, we return to the fact that the item taxed—gambling revenue—is identical."). In particular, LSCP compares itself to a biorefining plant located in Emmetsburg. Like LSCP, the Emmetsburg plant is directly connected, but because it is situated within two miles of the city of Emmetsburg, it is in the Emmetsburg CSA and therefore benefits from a replacement tax

rate of zero.[4]   *See* Iowa Code § 437A.3(22)(*a*)(1)(j) (establishing the Emmetsburg CSA).  This disparity of taxation, LSCP posits, violates our constitutional command that "[a]ll persons in like situations should stand equal before the law."  *Chi. & Nw. Ry. v. Fachman*, 255 Iowa 989, 1002, 125 N.W.2d 210, 217 (1963).

2.  *Limitations period for refund claims.*  LSCP contends the shorter limitations period for refund claims based on a constitutional objection also violates the Federal Equal Protection Clause and article I, section 6 of the Iowa Constitution.  In LSCP's view, the shorter limitations period draws a classification between constitutional claims and other types of claims, and therefore impedes its fundamental right of meaningful access to the courts to resolve constitutional claims.  Because it contends a fundamental right is at stake, LSCP urges our application of strict scrutiny analysis rather than the less demanding rational basis standard.

3.  *Dormant Commerce Clause.*  Finally, LSCP posits that the natural gas replacement tax penalizes consumers purchasing natural gas from nonresident suppliers.  The penalty arises, LSCP asserts, because LDCs have freedom to allocate their replacement tax burden among their customers at different rates—and, because LDCs often *do* allocate the tax burden differently, many high-volume LDC customers pay tax at a lower rate than does LSCP.  Because there are no natural gas suppliers in Iowa, LSCP contends the statutory framework establishing the higher rate it pays as a directly connected consumer is applied only to

---

[4]A witness for the Department explained that the replacement tax formula under sections 437A.5(3)(*a*)–(*c*) utilizes only "centrally assessed" tax liability.  *See* Iowa Code § 437A.5(3)(*a*).  Because municipalities are *locally* assessed, the witness explained, the numerator in the fraction prescribed in section 437A.5(3) would always be zero for many municipal CSAs.

transactions involving nonresident suppliers in violation of the dormant Commerce Clause.

**B. The Department.**

1. *Equal protection.* The Department first asserts LSCP is not similarly situated to any "individuals who are allegedly treated differently under the challenged statute." *Timberland Partners XXI, LLP v. Iowa Dep't of Revenue*, 757 N.W.2d 172, 175 (Iowa 2008); *see City of Coralville v. Iowa Utils. Bd.*, 750 N.W.2d 523, 531 (Iowa 2008) ("Dissimilar treatment of persons dissimilarly situated does not offend equal protection."). In *City of Coralville*, we said "[c]itizens serviced by different public utilities are not similarly situated." *City of Coralville*, 750 N.W.2d at 531. Relying on this language, the Department asserts LSCP is not similarly situated to ethanol plants in other CSAs, even if those other ethanol plants are directly connected natural gas consumers. In other words, the Department contends each directly connected ethanol plant is a customer of a different public utility: itself.

But even assuming LSCP *is* similarly situated to other replacement taxpayers, the Department contends ample rational bases for the replacement tax regime are elucidated in the legislature's 1998 enactment. In particular, the Department relies on legislative findings accompanying the enactment and a separate section of the statute entitled "PURPOSES." 1998 Iowa Acts ch. 1194, §§ 1, 3. With these expressly stated legislative purposes as a backdrop, the Department asserts the tax need only be applied uniformly, and the fact that the consequences may not be uniform is of no moment. *See City of Coralville*, 750 N.W.2d at 530–31.

2. *Limitations period for refund claims.* The Department concedes chapter 437A provides a shorter limitations period for refund claims

based on constitutional objections. However, it contends rational basis analysis—not strict scrutiny—is the appropriate test for constitutional challenges involving different limitations periods. *See Fed. Land Bank of Omaha v. Arnold*, 426 N.W.2d 153, 156 (Iowa 1988) (applying the rational basis test to "different redemption periods for 'member' and 'nonmember' institutions"); *Conner v. Fettkether*, 294 N.W.2d 61, 62 (Iowa 1980) (applying the rational basis test to a limitations period for tort claims that depended upon the plaintiff's age). Applying that standard, the Department asserts the legislature had a rational basis for subjecting constitutional claims to a shorter limitations period. Specifically, it contends a shorter limitations period for constitutional challenges launched against tax statutes limits the amounts of refunds to which state coffers are potentially exposed and promotes predictable fiscal planning for governmental entities. *See Am. States Ins. Co. v. State*, 560 N.W.2d 644, 650 (Mich. Ct. App. 1996) ("Protection of the state treasury is certainly a legitimate state purpose.").

3. *Dormant Commerce Clause.* The Department contends LSCP lacks standing to bring a dormant Commerce Clause challenge because it is not an out-of-state supplier being taxed discriminatorily. Further, the Department contends LSCP lacks standing because the statutory framework does not impose an *additional* sales tax only on out-of-state transactions, like the tax scheme at issue in *General Motors Corp. v. Tracy*, 519 U.S. 278, 282, 117 S. Ct. 811, 816, 136 L. Ed. 2d 761, 770 (1997).

On the merits, the Department asserts LSCP mischaracterizes the necessary comparison under the dormant Commerce Clause. It states the comparison is not between LSCP and customers who obtain gas through an LDC; rather, the comparison is between LSCP and LDCs

themselves. While individual LDC customers may pay lower rates than LSCP, they do so only because LDCs are allowed to pass their delivery tax costs to their customers through tariffs, and can do so at varying rates. LDCs, however, are ultimately liable for the entire amount of their respective delivery tax at the same rate as LSCP. Therefore, the Department asserts, the replacement tax formula does not discriminate against LSCP for its decision to bypass the LDC, nor does it discriminate against interstate commerce in general.

**IV. Analysis.**

We address only the substantive constitutional challenges to the replacement tax itself. Our conclusions on those issues obviate any need to address the limitations period issue.

**A. Equal Protection.** LSCP raises claims under both the Fourteenth Amendment to the United States Constitution and article I, section 6 of the Iowa Constitution. It relies principally on our decision in *RACI II*, in which we distinguished between the two provisions. *RACI II*, 675 N.W.2d at 5–7. We may conclude the state provision is more protective. *See id.* at 6–7. However, on a basic level, both constitutions establish the general rule that similarly situated citizens should be treated alike. *Qwest Corp.*, 829 N.W.2d at 558.

1. *Fourteenth Amendment.* The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The United States Supreme Court has explained that "state tax classifications require only a rational basis to satisfy the Equal Protection Clause." *Tracy*, 519 U.S. at 311, 117 S. Ct. at 830, 136 L. Ed. 2d at 787; *accord Fitzgerald*, 539 U.S. at 106–07, 123 S. Ct. at 2159, 156 L. Ed. 2d at 102–03; *see also Armour v. City of Indianapolis*, ___ U.S. ___,

___, 132 S. Ct. 2073, 2080, 182 L. Ed. 2d 998, 1005 (2012) (applying the rational basis test because "Indianapolis'[s tax] classification involves neither a 'fundamental right' nor a 'suspect' classification"). Under the rational basis test,

> the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S. Ct. 2326, 2332, 120 L. Ed. 2d 1, 13 (1992) (citations omitted).

The rational basis standard as applied in equal protection claims grounded in the Fourteenth Amendment "is especially deferential in the context of classifications made by complex tax laws." *Id.*; *see also Madden v. Kentucky*, 309 U.S. 83, 88, 60 S. Ct. 406, 408, 84 L. Ed. 590, 593 (1940) ("[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification."). It does not require optimal or perfect line-drawing, instead requiring "only that the line actually drawn be a rational line." *Armour*, ___ U.S. at ___, 132 S. Ct. at 2083, 182 L. Ed. 2d at 1008. "But there is a point beyond which the State cannot go without violating the Equal Protection Clause. The State . . . may not resort to a classification that is palpably arbitrary." *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 527, 79 S. Ct. 437, 441, 3 L. Ed. 2d 480, 485 (1959).

The Supreme Court's decision in *Fitzgerald* provides an illustration of geographic tax rate differences that have been found consistent with the Federal Equal Protection Clause. *Fitzgerald*, 539 U.S. at 110, 123 S. Ct. at 2161, 156 L. Ed. 2d at 105. In *Fitzgerald*, Iowa assessed slot

machine gambling revenue from riverboat casinos at a maximum rate of twenty percent. *Id.* at 105, 123 S. Ct. at 2158, 156 L. Ed. 2d at 102. The legislature later passed a law authorizing additional slot machine gambling at racetracks[5]—yet taxed revenue from those machines at a higher rate of thirty-six percent. *Id.* The Supreme Court emphasized that tax legislation must be viewed as a whole. *Id.* at 108, 123 S. Ct. at 2160, 156 L. Ed. 2d at 103. Thus, although the racetracks were subject to a higher tax rate based on geographic location, the Court concluded that, under the Fourteenth Amendment, the differential in statewide tax rates was rationally related to promoting economic development in certain communities or protecting a reliance interest the riverboat operators had developed. *Id.* at 109, 123 S. Ct. at 2160, 156 L. Ed. 2d at 104. Accordingly, the Court found the differential tax rate did not violate the Fourteenth Amendment's Equal Protection Clause. *Id.* at 110, 123 S. Ct. at 2161, 156 L. Ed. 2d at 105.

Applying the rational basis analysis articulated by the Supreme Court in *Fitzgerald*, we find alternative rational bases for the natural gas replacement tax structure. For example, the legislature may have wished to promote economic development in municipalities by creating CSAs featuring municipal LDCs offering tax advantages for new business prospects. *See id.* at 109, 123 S. Ct. at 2160, 156 L. Ed. 2d at 104 (concluding a lower tax rate for riverboat slot machine revenue was rationally related to "encourag[ing] the economic development of river communities"). Similarly, the legislature may have had reasonable grounds for exempting from the replacement tax consumers of natural

---

[5]A racetrack that also offers slot machine gambling is called a racino. *See DePaul v. Commonwealth*, 969 A.2d 536, 548 n.14 (Pa. 2009).

gas who had directly connected before the new tax formulation was adopted in 1998 in reliance on the former ad valorem system. The legislature could have believed those consumers should be shielded from the replacement tax under section 437A.5(2) because it would upend their reliance and significantly—perhaps unfairly—increase their tax liability. *See id.* (concluding a difference in tax rates for riverboat slot machine revenue and racino slot machine revenue was rationally related to protecting riverboat operators' reliance interest on the lower rate); *City of New Orleans v. Dukes*, 427 U.S. 297, 298, 305, 96 S. Ct. 2513, 2514, 2518, 49 L. Ed. 2d 511, 514, 518 (1976) (per curiam) (concluding a city ordinance satisfied the rational basis test when it only allowed pushcart food vendors in the French Quarter to continue operating if they had been operating for at least eight years, because "newer businesses were less likely to have built up substantial reliance interests"); *see also* Iowa Code § 437A.5(7) (exempting direct-connect consumers from the replacement tax under section 437A.5(2) if their direct-connect facilities were already in place on January 1, 1999).

Because we conclude these objectives supply a rational basis under the standard expressed by the Supreme Court, we conclude the variable tax rates survive LSCP's equal protection challenge based on the Fourteenth Amendment. *See Fitzgerald*, 539 U.S. at 110, 123 S. Ct. at 2161, 156 L. Ed. 2d at 105. Thus, we need not consider whether the replacement delivery tax is also rationally related to other state interests. *See Nordlinger*, 505 U.S. at 14 n.5, 112 S. Ct. at 2334 n.5, 120 L. Ed. 2d at 15 n.5. We conclude Iowa's natural gas delivery tax does not violate the Federal Equal Protection Clause when imposed on a directly connected consumer under section 437A.5(2).

2. *Article I, section 6.* Article I, section 6 provides, "All laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6.[6] Recognizing that constitutional command, we have said "[l]aws relating to taxation . . . must have a uniform operation to meet the requirements of constitutional provisions." *W.J. Sandberg Co. v. Iowa State Bd. of Assessment & Review*, 225 Iowa 103, 109–10, 278 N.W. 643, 646 (1938). However, uniform operation does not necessarily require uniform consequences. *See City of Coralville*, 750 N.W.2d at 530–31; *City of Waterloo v. Selden*, 251 N.W.2d 506, 508–09 (Iowa 1977) ("An iron rule of equal taxation is neither attainable nor necessary."); *Cook v. Dewey*, 233 Iowa 516, 519, 10 N.W.2d 8, 10 (1943) ("The constitution requires uniform operation throughout the State, not uniformity of consequences resulting from such operation." (Internal quotation marks omitted.)); *W.J. Sandberg Co.*, 225 Iowa at 110, 278 N.W. at 646 ("[I]n the matter of taxation, perfect uniformity, which . . . means an equal distribution of the burdens of taxation upon all persons of a given class, is impossible of perfect application.").

Like the United States Supreme Court's application of rational basis review to Fourteenth Amendment equal protection challenges, we ensure uniform operation under the Iowa Constitution by reviewing economic legislation—which includes tax statutes—under a rational

---

[6]In recent cases, we have "refer[red] to article I, section 6 as the 'equal protection clause' of the Iowa Constitution." *Qwest Corp.*, 829 N.W.2d at 557 n.4 (collecting cases). In some instances, we have called article I, section 6 the "equality provision." *See, e.g.*, *In re A.W.*, 741 N.W.2d 793, 806 (Iowa 2007); *RACI II*, 675 N.W.2d at 7; *Chi. & Nw. Ry.*, 255 Iowa at 996, 125 N.W.2d at 214.

basis test.[7]  *See Qwest Corp.*, 829 N.W.2d at 558.  In *Qwest Corp.*, we explained to pass the rational basis test, the statute must be " 'rationally related to a legitimate state interest.' "  *Id.* (quoting *Sanchez v. State*, 692 N.W.2d 812, 817–18 (Iowa 2005)); *see also City of Coralville*, 750 N.W.2d at 530.  A legitimate interest can be any reasonable justification, not just the one the legislature actually chose.  *See Qwest Corp.*, 829 N.W.2d at 558; *RACI II*, 675 N.W.2d at 8 ("[A] person challenging a statute shoulders a heavy burden . . . .  This burden includes the task of negating every reasonable basis that might support the disparate treatment." (Citations omitted.)).  Further, the fit between the means chosen by the legislature and its objective need only be rational, not perfect.  *See Qwest Corp.*, 829 N.W.2d at 558.

"We have said before the legislature acts with broad authority in the realm of taxation."  *RACI I*, 648 N.W.2d at 558; *accord Hearst Corp. v. Iowa Dep't of Revenue & Fin.*, 461 N.W.2d 295, 305 (Iowa 1990); *Selden*, 251 N.W.2d at 508.  Thus, "[w]hen we have applied the rational basis test to tax laws, they have generally been upheld without much difficulty." *Qwest Corp.*, 829 N.W.2d at 558; *accord Sperfslage v. Ames City Bd. of Review*, 480 N.W.2d 47, 49 (Iowa 1992) ("Th[e rational basis] standard is easily satisfied in challenges to tax statutes."); *Hearst Corp.*, 461 N.W.2d at 306; *Heritage Cablevision v. Marion Cnty. Bd. of Supervisors*, 436 N.W.2d 37, 38 (Iowa 1989).  After all, "[t]axing statutes are presumed to

---

[7]Rational basis analysis under article I, section 6 of the Iowa Constitution is not, however, constrained by or limited to judicial interpretations of the Fourteenth Amendment Equal Protection Clause.  "[W]e maintain our authority to adopt our own equal protection analysis under the Iowa Constitution . . . ."  *City of Coralville*, 750 N.W.2d at 530; *see also RACI II*, 675 N.W.2d at 4 ("It is this court's constitutional obligation as the highest court of this sovereign state to determine whether the challenged classification violates Iowa's constitutional equality provision.").

be constitutional." *Home Builders Ass'n of Greater Des Moines v. City of West Des Moines*, 644 N.W.2d 339, 352 (Iowa 2002); *accord Sperfslage*, 480 N.W.2d at 49 ("We recognize a presumption favoring the constitutionality of taxing statutes.").

"These rigorous standards have not, however, prevented this court from finding economic . . . legislation in violation of equal protection provisions." *RACI II*, 675 N.W.2d at 8–9. "[E]ven in the economic sphere, a citizen's guarantee of equal protection is violated if desirable legislative goals are achieved . . . through wholly arbitrary classifications or otherwise invidious discrimination." *Fed. Land Bank*, 426 N.W.2d at 156. Thus, the deference we afford the legislature's classifications "is not, in and of itself, necessarily dispositive" under article I, section 6. *Bierkamp v. Rogers*, 293 N.W.2d 577, 581 (Iowa 1980). "It is for the judicial department to determine whether any department has exceeded its constitutional functions . . . ." *Luse v. Wray*, 254 N.W.2d 324, 327 (Iowa 1977) (internal quotation marks omitted).

"The first step of [analyzing] an equal protection claim is to identify the classes of similarly situated persons singled out for differential treatment." *Grovijohn v. Virjon, Inc.*, 643 N.W.2d 200, 204 (Iowa 2002). "If a plaintiff fails to articulate, and the court is unable to identify, a class of similarly situated individuals who are allegedly treated differently under the challenged statute," our analysis ends and we need not consider whether the ends are legitimate and the means rationally related. *Timberland Partners*, 757 N.W.2d at 175. However, "[n]o two groups are identical in *every* way," so LSCP is not required to show it mirrors another class of taxpayers exactly. *See Qwest Corp.*, 829 N.W.2d at 561 (emphasis added).

In this case, LSCP posits the relevant class consists of all directly connected ethanol plants located in Iowa who pay tax rates that differ solely based on their geographic location. The directly connected plants all bypass an LDC, obtain natural gas directly from an interstate pipeline, and use that gas to produce ethanol and related byproducts. In contrast, the Department, relying on our decision in *City of Coralville*, contends "[c]itizens serviced by different public utilities are not similarly situated." *City of Coralville*, 750 N.W.2d at 531. In other words, the Department asserts each directly connected ethanol plant acts as *its own* utility, with itself as a customer—and therefore, LSCP cannot demonstrate any similarly situated class of taxpayers treated differently in violation of article I, section 6. *See Timberland Partners*, 757 N.W.2d at 175.

In *Qwest Corp.*, we cautioned against making intricate distinctions between purported classes of similarly situated individuals, because if we did so, almost every equal protection claim could be resolved against the plaintiffs on the "similarly situated" requirement. *Qwest Corp.*, 829 N.W.2d at 561. We therefore assumed the two proffered groups in *Qwest Corp.* were similarly situated, without deciding the question. *See id.* We do the same here. We assume (without deciding) for purposes of analysis that LSCP has identified a class of similarly situated taxpayers subjected to allegedly different treatment.

We now proceed to the next step of equal protection analysis. In this step, "we must examine the legitimacy of the end to be achieved; we then scrutinize the means used to achieve that end." *Fed. Land Bank*, 426 N.W.2d at 156.

At the legitimacy step, our rational basis test under article I, section 6 is not toothless. *See RACI II*, 675 N.W.2d at 9. To determine whether the ends are legitimate, we first ask whether

> the claimed state interest [is] *realistically* conceivable. Our court must then decide whether this reason has a basis in fact. Finally, we must consider whether the relationship between the classification . . . and the purpose of the classification is so weak that the classification must be viewed as arbitrary.

*Id.* at 7–8 (citations omitted) (footnotes omitted). The "realistically conceivable" standard requires more than "a purely superficial analysis and implies that the court is permitted to 'probe to determine if the constitutional requirement of some rationality in the nature of the class singled out has been met.' " *Id.* at 7 n.3 (quoting *Greenwalt v. Ram Rest. Corp. of Wyo.*, 71 P.3d 717, 731 (Wyo. 2003)). "Basis in fact" means "the court will undertake some examination of the credibility of the asserted factual basis for the challenged classification rather than simply accepting it at face value." *Id.* at 8 & n.4. In other words, although "actual proof of an asserted justification [i]s not necessary, . . . the court w[ill] not simply accept it at face value and w[ill] examine it to determine whether it [i]s credible as opposed to specious." *Qwest Corp.*, 829 N.W.2d at 560; *see RACI II*, 675 N.W.2d at 7 n.3 (differentiating between "credible" and "specious").

When it enacted chapter 437A, the legislature expressly identified the interests it sought to advance. For example, the legislature announced an objective to "remove tax costs as a factor in a competitive environment by imposing like generation, transmission, and delivery taxes on similarly situated competitors who generate, transmit, or deliver . . . natural gas in the same [CSA]." Iowa Code § 437A.2. In other words, the legislature sought to promote competition in the natural gas delivery

market by preventing companies with no property in the state—and therefore, few if any assets reached by the ad valorem tax—from enjoying an unfair advantage due to their comparatively lower tax liability. The legislature also expressly announced its objective "to preserve revenue neutrality and debt capacity for local governments and taxpayers" by creating a new and different system generating tax revenue calculated to replicate the amount that was collectible under the prior framework. *See id.* The legislature chose to advance this objective by creating a new variable tax rate dependent on the centrally assessed property tax liability allocated to the natural gas service of each taxpayer principally serving each CSA, averaged over tax years 1993 to 1997 under the former ad valorem tax structure. *See* Iowa Code § 437A.5(3).

In adopting the new replacement tax formulation, the legislature explained its reasons for eschewing "imposition of a single statewide delivery tax rate [that] would unfairly increase tax costs for some taxpayers while reducing such costs for others." 1998 Iowa Acts ch. 1194, § 1. The legislature expressly rejected LSCP's preference for statewide rate uniformity, finding it "would impede a competitive environment." *Id.* In addition to the goals of market competition and revenue continuity, the legislature noted its policy objective of providing "a system of taxation which reduces existing administrative burdens on state government." Iowa Code § 437A.2.

Although in the process of rational basis review we do not simply accept claimed legitimacy of the interests (the ends) legislation purports to advance, LSCP does not contest the legitimacy of the interests expressly proffered by the Department in this case. Rather, LSCP contends the means and ends bear no rational relation to one another. *See Fed. Land Bank,* 426 N.W.2d at 156–57 ("FLB concedes the

legitimacy of the challenged legislation's public purpose. . . . The question is whether these legitimate goals are rationally served by [the] legislative scheme . . . ."). We now turn to that question.

When applying the rational basis test, we uphold a classification against an equal protection challenge statute if it is rationally related to at least one legitimate state interest. *See City of Coralville*, 750 N.W.2d at 530 ("[W]e will sustain a legislative classification if it is rationally related to *a* legitimate state interest." (Emphasis added.)). Thus, if we determine rate variation based on the taxpayer's geographic location is a rational classification made in furtherance of any legitimate state interest, we will uphold the replacement tax framework against LSCP's challenge.

Under the Iowa Constitution, we determine whether a classification rationally furthers a legitimate state interest by evaluating whether the classification features "extreme degrees of overinclusion and underinclusion in relation to any particular goal." *Bierkamp*, 293 N.W.2d at 584; *see also RACI II*, 675 N.W.2d at 10. If a classification involves extreme overinclusion or underinclusion "in relation to any particular goal, it cannot [reasonably] be said to . . . further that goal." *Bierkamp*, 293 N.W.2d at 584. Although LSCP does not expressly raise its challenges in terms of extreme over- or underinclusiveness, its assertions can be characterized under that framework. For example, LSCP implicitly asserts the replacement delivery tax regime is both overinclusive and underinclusive because LSCP and other directly connected consumers are shoehorned into the system, while preexisting directly connected consumers are exempt. In particular, LSCP contends the replacement tax regime is overinclusive—sweeping in taxpayers that should not be subject to it—because the rate in LSCP's CSA is based on

historic property values LSCP cannot control; because LSCP cannot affect its own replacement tax rate; and because LSCP cannot pass tax costs to customers through a tariff.

We conclude none of these assertions identifies a classification that is extremely overinclusive and underinclusive. The 1998 session law enacting the replacement tax stated in part that the legislature wanted to ensure fairness in the electricity and natural gas markets. *See* 1998 Iowa Acts ch. 1194, §§ 1, 3. For example, the legislature found "a single statewide delivery tax rate would unfairly increase tax costs for some taxpayers while reducing costs for others." *Id.* § 1. Thus, to prevent an unjust result, the legislature created geographic CSAs and developed a formula that would make any changes in tax liability much less drastic compared to the previous system than a single statewide tax rate would be. Similarly, the legislature wanted to remove tax costs as a factor in the competitive market for natural gas service. *See id.* § 3. Perhaps it was concerned a natural gas supplier could exploit the ad valorem system by locating in a low tax state and maintaining little or no property in Iowa, yet directing substantial service toward Iowa. Additionally, the legislature may have decided to avoid a potential loophole for consumers connecting directly to a pipeline after January 1, 1999, if the delivery tax did not apply to them—a loophole that *would* make tax costs a factor in location and bypass decisions. In other words, while the legislature created an exemption for "grandfathered" directly connected consumers and subjected future directly connected consumers to a tax rate they cannot control, we conclude these features of the classification are neither overinclusive nor underinclusive to an extreme degree. No constitutional violation results unless "a classification involves *extreme*

*degrees* of overinclusion and underinclusion in relation to any particular goal." *Bierkamp*, 293 N.W.2d at 584 (emphasis added).

We conclude the legislature could have rationally believed[8] the replacement tax regime—switching to an excise tax and imposing that tax on directly connected consumers at rates prevailing within the CSA where they are located—was rationally related to its goals. The replacement delivery tax may not create uniform results, but "the law operates uniformly in the constitutional sense." *Cook*, 233 Iowa at 519, 10 N.W.2d at 10. It does not violate article I, section 6 of the Iowa Constitution.

**B. Dormant Commerce Clause.** In *KFC Corp. v. Iowa Department of Revenue*, we explained the background of the dormant Commerce Clause:

> The United States Constitution expressly authorizes Congress to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Since the nineteenth century, the United States Supreme Court has interpreted the Commerce Clause as more than merely an affirmative grant of power, finding a negative sweep to the Clause as

---

[8]In *Bierkamp*, we explained "changes in underlying circumstances may vitiate any rational basis." *Bierkamp*, 293 N.W.2d at 581. Further, "the passage of time may call for a less deferential standard of review as the experimental or trial nature of legislation is less evident." *Id.*; *see also State v. Groves*, 742 N.W.2d 90, 93 (Iowa 2007) ("[W]hen applying a rational basis test under the Iowa Constitution, changes in the underlying circumstances can allow us to find a statute no longer rationally relates to a legitimate government purpose."). LSCP relies on our statement in *Bierkamp* and contends while there may originally have been a rational basis between some ends and the means used to achieve them, that basis no longer exists—and we can properly determine the relation using a present-day viewpoint rather than a retrospective one.

However, we have never applied the *Bierkamp* reevaluation standard to an equal protection claim involving a tax statute. *See Qwest Corp.*, 829 N.W.2d at 562 & n.7. Further, we have stated the standard generally applies when the changed circumstances are developing legal trends—not simply a look back in time to verify whether the legislature actually accomplished its goals. *Qwest Corp.*, 829 N.W.2d at 562 n.7. "There have been no [major] developments of which we are aware in . . . tax jurisprudence." *Id.* Accordingly, we decline to apply the *Bierkamp* reevaluation standard in this case.

well. *See Brown v. Maryland*, 25 U.S. (12 Wheat.) 419, 448–49, 6 L. Ed. 678, 688–89 (1827); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 72–78, 6 L. Ed. 23, 70–78 (1824). As a result, the Supreme Court has applied the "negative" or "dormant" Commerce Clause to limit state taxation powers notwithstanding the absence of congressional legislation.

*KFC Corp. v. Iowa Dep't of Revenue*, 792 N.W.2d 308, 313 (Iowa 2010). In short, the dormant Commerce Clause "limits the power of the states to erect barriers against interstate trade." *Iowa Auto. Dealers Ass'n v. Iowa State Appeal Bd.*, 420 N.W.2d 460, 462 (Iowa 1988).

The Supreme Court has further explained the "dormant" aspect of the Commerce Clause: "The negative or dormant implication of the Commerce Clause prohibits state taxation . . . that discriminates against or unduly burdens interstate commerce . . . ." *Tracy*, 519 U.S. at 287, 117 S. Ct. at 818, 136 L. Ed. 2d at 773. In this context, the term "discrimination" means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99, 114 S. Ct. 1345, 1350, 128 L. Ed. 2d 13, 21 (1994); *accord NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 48 (Iowa 2012). Before evaluating whether chapter 437A discriminates against or unduly burdens interstate commerce, however, we must first determine whether LSCP has standing to raise this dormant Commerce Clause challenge.

1. *Standing to raise a dormant Commerce Clause claim.* Usually, parties asserting dormant Commerce Clause challenges are out-of-state entities subjected to an allegedly discriminatory regulation. *See, e.g., Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 339, 97 S. Ct. 2434, 2439, 53 L. Ed. 2d 383, 391 (1977) (noting the Washington plaintiff challenging a North Carolina regulation brought suit in North Carolina federal court); *Complete Auto Transit, Inc. v. Brady*, 430 U.S.

274, 275–76, 97 S. Ct. 1076, 1077, 51 L. Ed. 2d 326, 328–29 (1977) (noting the plaintiff was a Michigan company challenging a Mississippi tax assessment); *KFC Corp.*, 792 N.W.2d at 310 (noting the plaintiff was "a Delaware corporation with its principal place of business in Louisville, Kentucky" that owned no properties in Iowa). The Department asserts because LSCP is not an out-of-state entity allegedly subjected to discriminatory treatment under chapter 437A, it has no standing to challenge the statute under the dormant Commerce Clause.

However, "cognizable injury from unconstitutional discrimination against interstate commerce does not stop at members of the class against whom a State ultimately discriminates." *Tracy*, 519 U.S. at 286, 117 S. Ct. at 818, 136 L. Ed. 2d at 772. In *Tracy*, a case also involving tax on natural gas, the Supreme Court stated customers of the class subjected to discrimination "may also be injured, as . . . where the customer is liable for payment of the tax and as a result presumably pays more for the gas it gets from out-of-state producers and marketers." *Id.* Further, at least two other Supreme Court cases have demonstrated that in-state plaintiffs are not precluded from raising dormant Commerce Clause challenges. *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 190–91, 114 S. Ct. 2205, 2209–10, 129 L. Ed. 2d 157, 165 (1994) (noting the plaintiffs were Massachusetts milk dealers asserting a monthly premium payment distributed only to in-state farmers violated the dormant Commerce Clause); *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 267, 104 S. Ct. 3049, 3053, 82 L. Ed. 2d 200, 206–07 (1984) (concluding in-state liquor wholesalers had standing to challenge Hawaii's liquor tax, in part because they were "entitled to litigate whether the . . . tax has had an adverse competitive impact on their business").

We assume, without deciding, that LSCP has standing in this case. We do so because we conclude even if LSCP has standing, the replacement delivery tax framework does not violate the dormant Commerce Clause. *Cf. Qwest Corp.*, 829 N.W.2d at 561–62 (assuming equal protection plaintiffs were similarly situated because their claims failed on the merits). We now explain why that is so.

2. *The* Complete Auto Transit *test.* In *Complete Auto Transit,* the Supreme Court stated a tax can survive a Commerce Clause challenge "when the tax is applied to an activity with a substantial nexus to the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto Transit,* 430 U.S. at 279, 97 S. Ct. at 1079, 51 L. Ed. 2d at 331. We must evaluate whether each of these requirements is met.

"Substantial nexus" means more than "a proxy for notice"—its meaning in due process cases. *See Quill Corp. v. North Dakota*, 504 U.S. 298, 313, 112 S. Ct. 1904, 1913–14, 119 L. Ed. 2d 91, 107 (1992). Nonetheless, the replacement tax on natural gas delivery clearly has a nexus to Iowa because it involves taxation of natural gas delivered into Iowa for consumption here. *See KFC Corp.*, 792 N.W.2d at 328 (concluding the Department could tax an out-of-state company's "revenue earned . . . from the use of its intangibles by franchisees located within the State of Iowa").

A tax is fairly apportioned when a state only taxes its fair share of the property or activity. *See Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 184–85, 115 S. Ct. 1331, 1338, 131 L. Ed. 2d 261, 271 (1995). A fairly apportioned tax must be both internally and externally consistent. *Id.* at 185, 115 S. Ct. at 1338, 131 L. Ed. 2d at 271–72.

Internal consistency occurs when every other state could adopt the same tax without placing "interstate commerce at a disadvantage as compared with commerce intrastate." *Id.* External consistency occurs if a state does not tax anything "beyond that portion of value fairly attributable to economic activity within the taxing state." *Id.* at 185, 115 S. Ct. at 1338, 131 L. Ed. 2d at 272. These two requirements are somewhat related because if a state achieves external consistency, any other state could adopt the same regime without overburdening interstate commerce. Here, Iowa only taxes activity within the state—natural gas delivered into Iowa. Accordingly, we conclude the replacement tax is fairly apportioned.

A tax is fairly related to services when it "is assessed in proportion to a taxpayer's activities or presence in a State." *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 627, 101 S. Ct. 2946, 2958, 69 L. Ed. 2d 884, 900 (1981); *see also Moorman Mfg. Co. v. Bair*, 254 N.W.2d 737, 750 (Iowa 1977). When this occurs, "the taxpayer is shouldering its fair share of supporting the State's" services such as police and fire protection. *Commonwealth Edison Co.*, 453 U.S. at 627, 101 S. Ct. at 2958, 69 L. Ed. 2d at 900. In *Commonwealth Edison Co.*, the Supreme Court concluded a Montana tax on coal mining satisfied this element because it was "measured as a percentage of the value of the coal taken." *Id.* at 626, 101 S. Ct. at 2958, 69 L. Ed. 2d at 900. The tax was related only to the coal mined in Montana, and here the replacement tax is related only to the natural gas delivered in Iowa. We conclude the tax is fairly related to services provided by the State.

We now turn to the question of whether the tax is discriminatory.

3. *Differential treatment amounting to discrimination.* A discriminatory regulation can be directly and facially discriminatory or

have discriminatory effect. *See Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S. Ct. 2080, 2084, 90 L. Ed. 2d 552, 559–60 (1986); *Iowa Auto. Dealers Ass'n*, 420 N.W.2d at 462. We address each of these features of discrimination in turn.

A regulation that directly discriminates against out-of-state economic interests is relatively easy to spot. Regulations or statutes that are per se discriminatory often make the distinction between in-state and out-of-state interests expressly. *See, e.g.*, *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 568, 117 S. Ct. 1590, 1594, 137 L. Ed. 2d 852, 859 (1997) (discussing a Maine statute that expressly provided fewer tax benefits to charities serving non-Maine residents than to charities serving Maine residents); *Fulton Corp. v. Faulkner*, 516 U.S. 325, 333, 116 S. Ct. 848, 855, 133 L. Ed. 2d 796, 806 (1996) (finding facially discriminatory a North Carolina tax regime that expressly "taxes stock only to the degree that its issuing corporation participates in interstate commerce"); *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 338–39, 112 S. Ct. 2009, 2012, 119 L. Ed. 2d 121, 129–30 (1992) (describing an Alabama statute that expressly imposed an additional hazardous waste disposal fee only on hazardous waste originating outside Alabama). Iowa's replacement tax on natural gas delivery does not make an express distinction because it applies to all therms of natural gas delivered within the state, regardless of whether the gas goes directly from an interstate pipeline to a consumer or is first routed through an LDC. Accordingly, the natural gas delivery tax does not directly discriminate against interstate commerce.

"A state law is discriminatory in effect when, in practice, it affects similarly situated entities in a market by imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-

state interests." *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 10 (1st Cir. 2010). In *Family Winemakers*, the similarly situated entities were wine producers and the relevant market was the market for wine sales in Massachusetts. *See id.* at 4. " 'Small' " wineries were allowed to sell "in three ways: by shipping directly to consumers, through wholesaler distribution, and through retail distribution." *Id.* " 'Large' " wineries—none of which were located in Massachusetts—could not sell to retailers at all, and could only choose *either* to ship directly to consumers or to contract with a wholesaler. *Id.* The First Circuit Court of Appeals held the distinction between types of wineries and the distribution networks they were permitted to utilize "significantly alter[ed] the terms of competition" between in-state and out-of-state entities. *Id.* at 11.

Here, LSCP asserts the relevant market is for the consumption of natural gas, and the similarly situated entities are all consumers within the same CSA as LSCP—especially those that receive natural gas from an LDC. LSCP asserts because the LDC passes on its replacement tax burden to consumers at varying rates, the replacement tax's effect— when imposed on a directly connected consumer—is to incentivize contracting with an LDC and discourage direct connections, which by definition facilitate interstate transactions. LSCP analogizes to the relationship between sales tax and use tax, and contends the two must be equal. *See Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 648, 114 S. Ct. 1815, 1821, 128 L. Ed. 2d 639, 647 (1994) (finding Missouri's tax scheme that imposed an additional use tax only on out-of-state goods "r[an] afoul of the basic requirement that . . . the burdens imposed on interstate and intrastate commerce must be equal"). LSCP asserts section 437A.5(1) creates the functional equivalent of a sales tax, and section 437A.5(2) establishes the functional equivalent of a use tax—

because LDCs subject to section 437A.5(1) engage in in-state delivery, and directly connected consumers subject to section 437A.5(2) engage in transactions with out-of-state suppliers. Citing the *Lohman* rule, LSCP contends section 437A.5 provides LDC customers with what LSCP terms "a disguised Replacement Tax rate reduction" because LDCs are allowed to pass on their tax burden to their customers at varying rates.

We conclude LSCP's reliance on *Lohman* is misplaced. In *Lohman*, Missouri imposed "an 'additional use tax' of 1.5% on the privilege of storing, using, or consuming within the State any article of personal property purchased outside the State." *Id.* at 644, 114 S. Ct. at 1819, 128 L. Ed. 2d at 645. No statewide sales tax accompanied this additional use tax, but political subdivisions had discretion to impose additional sales taxes. *Id.* Thus, sales tax and use tax could be equal under the statutory scheme, but only if a political subdivision exercised its discretion to impose additional sales tax and fixed its additional sales tax at 1.5 percent. *See id.* By contrast, in this case, the replacement tax begins from a point of equivalence. Sections 437A.5(1) and (2) expressly impose the same tax on both LDCs and directly connected consumers. Iowa Code § 437A.5(1)–(2). Thus, the natural gas replacement tax is wholly unlike the scheme at issue in *Lohman*, and the discretion LDCs have to *allocate* their tax burden is wholly unlike the Missouri localities' discretion to create (or avoid creating) a tax burden in the first place.

Further, we conclude LSCP has misidentified the entities to which it is similarly situated for dormant Commerce Clause purposes. It is true that LSCP and LDC customers both consume natural gas. But the tax LSCP is challenging applies to the *delivery* of gas. An LDC's customers receive but do not deliver gas. Thus, LSCP is not similarly situated to LDCs' customers, but to LDCs themselves. Put another way, the tax is

imposed on entities obtaining gas from an interstate pipeline, not all entities obtaining gas from any source. To adapt a colloquialism, equating LSCP with the customers of LDCs in this context is like comparing apples to cantaloupes. *See Hunt,* 432 U.S. at 336, 97 S. Ct. at 2438, 53 L. Ed. 2d at 389–90; *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 139, 90 S. Ct. 844, 845–46, 25 L. Ed. 2d 174, 176–77 (1970).

A comparison of LSCP and any LDC wishing to provide service in the same CSA reveals there is no differential tax rate between them. *See* Iowa Code § 437A.5(2) (imposing upon directly connected consumers a tax "at the rates prescribed under subsection 1"—the same rate that applies to LDCs). The statutory framework exacts no penalty for participating in interstate commerce. Indeed, LDCs are participating in interstate commerce to the same extent—and subject to the same taxes—as directly connected natural gas consumers. An LDC is free to pass its tax burden on to customers, but it ultimately remains liable for the entire amount; the LDC itself is not subject to any rate reduction, disguised or otherwise. Further, LSCP can pass on the tax costs through the price of its product, just as LDCs do.

We conclude the replacement tax framework does not have a discriminatory effect on interstate commerce. Accordingly, the *Complete Auto Transit* test is satisfied and the tax as a whole does not violate the dormant Commerce Clause.

4. *Extraterritoriality.* Under the extraterritoriality doctrine, "a statute that directly controls commerce occurring wholly outside the boundaries of a State" is invalid. *Healy v. Beer Inst.,* 491 U.S. 324, 336, 109 S. Ct. 2491, 2499, 105 L. Ed. 2d 275, 288 (1989). "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.*

LSCP raises the extraterritoriality doctrine, but focuses on different language from *Healy*: the effect that "would arise if not one, but many or every, State adopted similar legislation." *Id.* LSCP summarizes its extraterritoriality argument this way:

> [LSCP]'s complaint is not that its therms are taxed more than once. Its complaint is that its therms are taxed more. If every state would adopt the Iowa Replacement Tax regime, and allow its LDCs to discount rates for large general service customers, while requiring their taxing authorities to demand the full rates from residents bypassing their LDCs, then all residents of all states would be rewarded for buying locally by saving taxes, thereby impeding interstate commerce.

As we have explained in our analysis of discriminatory effect, however, LSCP's therms are not taxed more than those an LDC delivers to customers. The Department still demands full rates from LDCs, but LDCs have the option to pass some of those costs on to consumers.

Further, the replacement tax does not violate the rule announced in *Healy* because it does not regulate conduct occurring "*wholly* outside the boundaries of a State." *Id.* at 336, 109 S. Ct. at 2499, 105 L. Ed. 2d at 288 (emphasis added). Because the replacement tax only applies when natural gas is delivered into Iowa, it does not violate the extraterritoriality doctrine.

**C. Limitations Period for Tax Refund Claims.** "[C]ourts have a duty to avoid constitutional questions when [the] merits of a case may be fairly decided without facing such questions." *Moorman Mfg. Co.*, 254 N.W.2d at 749; *see also Salsbury Labs. v. Iowa Dep't of Envtl. Quality*, 276 N.W.2d 830, 837 (Iowa 1979) ("Avoidance of constitutional issues except when necessary for proper disposition of [a] controversy is a bulwark of American jurisprudence."); *City of Des Moines v. Lohner*, 168 N.W.2d 779, 782 (Iowa 1969) ("We do not consider constitutional

questions unless it is necessary for the disposition of the case."). Because we have concluded the replacement tax regime is constitutional and LSCP is not entitled to receive a refund, we do not reach the question whether the different limitations period for refund claims based on constitutional objections is itself constitutional. *See Hawkeye Land Co. v. Iowa Utils. Bd.*, 847 N.W.2d 199, 209 (Iowa 2014); *Lohner*, 168 N.W.2d at 782.

## V. Conclusion.

A rational basis exists for the variable excise tax imposed on the delivery of natural gas under section 437A.5. Accordingly, we affirm the district court's determination that LSCP has failed to establish a violation of the Fourteenth Amendment of the United States Constitution or article I, section 6 of the Iowa Constitution. We also affirm the district court's determination that the natural gas delivery tax framework does not obstruct interstate commerce or discriminate against it in violation of the dormant Commerce Clause.

**AFFIRMED.**

All justices concur except Zager, J., who takes no part.