APPEL, Justice (dissenting).
I. Introduction.
House File 291 is an odd statute. See 2017 Iowa Acts ch. 2, §§ 1, 6 (codified at Iowa Code §§ 20.3(11), .9 (2018)). It slices and dices the universe of public employees entitled to collective bargaining by various categories in multiple novel ways that are overinclusive and underinclusive. One of the two ostensible purposes-labor peace-is advanced even though severe sanctions for striking have been in place for forty years, and during that period, there has never been a strike by any public employees. Further, the means chosen by the legislature-an arbitrary grouping and shuffling of public employees that is overinclusive and underinclusive-bears no rational relation to either labor peace or promoting the health and safety of public employees exposed to danger in their jobs.
In my view, therefore, the law does not survive rational basis review under article I, section 6 of the Iowa Constitution. Accordingly, I respectfully dissent.
II. Overview of House File 291.
I begin with a discussion of the remarkable classification system created by the law. It identifies an oddball group of public employees and throws them into the burlap grab bag labeled "public safety employee[s]." Id. § 1 (codified at Iowa Code § 20.3(11) ). Then, some of those within the *45 grab bag are denied privileges that others receive. Id. § 6. And some public employees not within the grab bag receive the benefits denied to a portion of public safety employees, while others do not. Id. Perplexing, I know. The classification system is illogical.
The identification of public safety employees is made not on the basis of an employee's duties or functions, but rather by the title an employee holds. Id. § 1 (codified at Iowa Code § 20.3(11) ). In some respects, the "public safety" grab bag is astonishingly inclusive. The grab bag was stretched astoundingly wide. It accommodates park rangers, gaming enforcement officers, and peace officers designated by the department of transportation. Id.
But then, it excludes employees with obvious public safety responsibilities. The grab bag has no room for university police who, just like other police officers, are law enforcement officers pursuant to Iowa Code chapter 80B, are trained and certified by the Iowa Law Enforcement Academy, and engage in law enforcement and emergency response alongside other city police officers. Id. Airport firefighters are excluded even though they too work alongside the firefighters designated as public safety employees by House File 291. Id. The law also excludes others, like parole officers and fraud bureau investigators, who work in unpredictable environments with broad arrest powers and the obligation to respond to emergencies. Id. And none of our state's corrections officers, jailers, and emergency medical service providers are considered public safety employees. Id. Yet all of those public employees work in "protection occupations." Iowa Code § 97B.49B(1)(e ).
As is evident, the statutory classification of public safety employees is obviously remarkably overinclusive and underinclusive. No one questions that. And no one questions that the overinclusiveness and underinclusiveness are among the features that make the classifications in House File 291 suspect.
I think it very doubtful that the classification of public safety employees makes much sense, but we are not done with the irrationalities of the statute. This is because classification as a public safety employee does not even determine whether a public employee gets the benefits of collective bargaining granted to some and denied others.
Under House File 291, full collective bargaining rights are provided to all state employees in bargaining units with at least thirty percent public safety employees. Id. § 6 (codified at Iowa Code § 20.9 ). In such a unit, the thirty percent public safety employees get the benefit of representatives who have the ability to collectively bargain fully over wages and a list of other terms and conditions of employment. Id. But so do the remaining seventy percent of non-"public safety employees" in the bargaining unit. Id. Thus, in a unit with thirty percent public safety employees, a supermajority of the beneficiaries are not public safety employees! If the law is designed to target public safety employees for preferential treatment, it is way, way overbroad.
And yet, once again, it is also underinclusive. What about a bargaining unit with twenty-nine percent public safety employees? Those public safety employees, along with their colleagues in the bargaining unit, are out in the cold. See id. For instance, we are told that the police officers serving the City of Guttenberg, along with the police and fire departments of the City of Decorah, are all relegated to disfavored status under House File 291. So too are the deputy sheriffs of Humboldt County, even though the county sheriffs and Humboldt *46 police officers serve side-by-side and share equipment.
Thus, the set of public safety employees benefiting from the statute is doubly underinclusive. The definition of "public safety employees" is underinclusive, and then only some public safety employees are doled out benefits based solely on whether the employee happens to fall within a given type of bargaining unit. Id. §§ 1, 6 (codified at Iowa Code §§ 20.3(11), .9).
What kind of statute is this? Notably, the parties have failed to identify a similar statute anywhere at any time. House File 291 is unlike the recent legislation passed in Wisconsin because, under the Wisconsin law, all those designated as public safety employees receive broader collective bargaining rights and all those who are not so designated do not receive those rights. See Wis. Educ. Ass'n Council v. Walker , 705 F.3d 640, 642-43 (7th Cir. 2013). Make no mistake, House File 291 is really odd.
III. Framework for Rational Basis Review.
Our approach to rational basis review is well-established. See LSCP, LLLP v. Kay-Decker , 861 N.W.2d 846, 859 (Iowa 2015) ; Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI ), 675 N.W.2d 1, 7-8 (Iowa 2004). In general terms, "to pass the rational basis test, the statute must be 'rationally related to a legitimate state interest.' " LSCP , 861 N.W.2d at 858 (quoting Qwest Corp. v. Iowa State Bd. of Tax Review , 829 N.W.2d 550, 558 (Iowa 2013) ). In undertaking our analysis, we employ a three-part test.
First, we identify the classes of similarly situated persons treated differently. LSCP , 861 N.W.2d at 859. This is a threshold determination. Id. We do not make intricate distinctions between purported classes of similarly situated individuals, as "[n]o two groups are identical in every way." Qwest , 829 N.W.2d at 561.
Next, we "examine the legitimacy of the end to be achieved." LSCP , 861 N.W.2d at 860 (quoting Fed. Land Bank of Omaha v. Arnold , 426 N.W.2d 153, 156 (Iowa 1988) ). We consider "whether there was a valid, 'realistically conceivable' purpose that served a legitimate government interest." Residential & Agric. Advisory Comm., LLC v. Dyersville City Council , 888 N.W.2d 24, 50 (Iowa 2016) (quoting McQuistion v. City of Clinton , 872 N.W.2d 817, 831 (Iowa 2015) ). "A legitimate interest can be any reasonable justification, not just the one the legislature actually chose."[12] LSCP , 861 N.W.2d at 858.
Our review of the legitimacy of the end to be achieved is not toothless. Id. at 860. We consider whether the claimed state interest is "realistically conceivable" and "decide whether this reason has a basis in fact." Id. (quoting RACI , 675 N.W.2d at 7-8 ). "The 'realistically conceivable' standard requires more than 'a purely superficial analysis and implies that the court is permitted to "probe to determine if the constitutional requirement of some rationality in the nature of the class singled out has been met." ' " Id. (quoting RACI , 675 N.W.2d at 7 n.3 ). " 'Basis in fact' means 'the court will undertake some examination of the credibility of the asserted factual basis for the challenged classification rather than simply accepting it at face value.' " Id. (quoting RACI , 675 N.W.2d at 8 n.4 ). "In other words, although 'actual proof of an asserted justification [i]s not necessary, ... the court w[ill] not simply accept it at *47 face value and w[ill] examine it to determine whether it [i]s credible as opposed to specious.' " Id. (alterations in original) (quoting Qwest , 829 N.W.2d at 560 ).
Third, we consider the relationship between the classification and the purpose of the classification. The fit between the means chosen by the legislature and its objective need not be perfect, but it must be rational. Id. at 859. "[W]e must consider whether the relationship between the classification ... and the purpose of the classification is so weak that the classification must be viewed as arbitrary." Id. at 860.
"Under the Iowa Constitution, we determine whether a classification rationally furthers a legitimate state interest by evaluating whether the classification features 'extreme degrees of overinclusion and underinclusion in relation to any particular goal.' " Id. at 861 (quoting Bierkamp v. Rogers , 293 N.W.2d 577, 584 (Iowa 1980) ). "If a classification involves extreme overinclusion or underinclusion 'in relation to any particular goal, it cannot [reasonably] be said to ... further that goal.' " Id. (quoting Bierkamp , 293 N.W.2d at 584 ).
Of course, we have explained that rational basis review is a "very deferential standard." NextEra Energy Res. LLC v. Iowa Utils. Bd. , 815 N.W.2d 30, 46 (Iowa 2012) (quoting Varnum v. Brien , 763 N.W.2d 862, 878 (Iowa 2009) ). "The plaintiff has the heavy burden of showing the statute unconstitutional and must negate every reasonable basis upon which the classification may be sustained." Id. (quoting Bierkamp , 293 N.W.2d at 579-80 ). Further, "[a] classification 'does not deny equal protection simply because in practice it results in some inequality; practical problems of government permit rough accommodations.' " Id. (alteration in original) (quoting In re Det. of Morrow , 616 N.W.2d 544, 548 (Iowa 2000) ).
But "[t]he deference we afford the legislature's classifications 'is not, in and of itself, necessarily dispositive' under article I, section 6." LSCP , 861 N.W.2d at 859 (quoting Bierkamp , 293 N.W.2d at 581 ). Our "rigorous standards have not ... prevented this court from finding economic ... legislation in violation of equal protection provisions." RACI , 675 N.W.2d at 8-9. "[E]ven in the economic sphere, a citizen's guarantee of equal protection is violated if desirable legislative goals are achieved ... through wholly arbitrary classifications or otherwise invidious discrimination." Fed. Land Bank , 426 N.W.2d at 156. "It is for the judicial department to determine whether any department has exceeded its constitutional functions...." Luse v. Wray , 254 N.W.2d 324, 327 (Iowa 1977) (quoting 16 C.J.S. Constitutional Law § 144, at 688).
IV. Applying Iowa's Rational Basis Review.
A. The Statutory Classifications. As described above, House File 291 classifies public employees in multiple unusual ways. Among the public employees with safety responsibilities, it identifies some as public safety employees and omits others. 2017 Iowa Acts ch. 2, § 1 (codified at Iowa Code § 20.3(11) ). Then, it goes on to even omit some of the public safety employees from the benefits of broader collective bargaining while allowing large numbers of those not branded as public safety employees to benefit from broader collective bargaining. Id. § 6 (codified at Iowa Code § 20.9 ).
Therefore, House File 291 treats many similarly situated persons differently. First, some public employees with safety responsibilities-like university police, airport firefighters, corrections officers, jailers, and emergency medical service providers-are similarly situated to other public employees with safety responsibilities *48 yet treated differently. See id. § 1 (codified at Iowa Code § 20.3(11) ). Second, only some of the public employees that House File 291 itself considers similarly situated-public safety employees-are able to benefit from broader collective bargaining. Id. § 6 (codified at Iowa Code § 20.9 ). Third, among the public employees that are not considered public safety employees by the law, some are able to engage in broader collective bargaining and others are not. Id.
B. Examining Ends. The State has suggested two purposes for House File 291-labor peace and the health and safety of public safety employees. Neither provides a basis for sustaining this statute.
I begin with the purported purpose of labor peace. First, the historical record is striking. No one claims that there has ever been a strike of any public employees, let alone public safety employees, since the enactment of the Public Employment Relations Act over forty years ago. Further, no one claims that such a strike has been seriously threatened. The lack of any facts to support the asserted rationale is troubling.
Second, as plaintiffs point out, labor peace was not a rationale for the law asserted by any Iowa legislators during the floor debate. That is striking. If there was truly a risk to public safety that a strike by public safety employees would create, surely the legislators would have said so. The fact that avoiding strikes was not even mentioned in the debates further suggests a lack of basis in fact.
Third, for forty years, draconian sanctions have been in place in the event any public employee contemplated striking. The sanctions can include imprisonment for six months; daily individual fines of $500; daily union fines of $10,000; termination from employment and ineligibility for public employment for one year; decertification of union and one-year waiting period for recertification; injunctions; contempt; and "any other legal or equitable remedy or penalty." Iowa Code § 20.12(3)-(6). The existence and effectiveness of the sanctions undermine the State's argument that labor peace is a purpose of the discriminatory treatment in House File 291. See, e.g. , U.S. Dep't of Agric. v. Moreno , 413 U.S. 528, 536-37, 93 S. Ct. 2821, 2827, 37 L.Ed.2d 782 (1973) (explaining that pre-existing provisions addressing fraud "necessarily casts[ ] considerable doubt upon the proposition that the 1971 amendment could rationally have been intended to prevent those very same abuses").
In Iowa, we "examin[e] ... the credibility of the asserted factual basis for the challenged classification rather than simply accepting it at face value." LSCP , 861 N.W.2d at 860 (quoting RACI , 675 N.W.2d at 8 & n.4 ). Based on the history, the lack of justification in legislative debates, and the existence of strong sanctions already addressing the problem, I conclude that the labor peace rationale fails that test.
As an alternative, the State generally claims that the health and safety of certain endangered public employees could be a legitimate end for the law. No one questions the general proposition that promoting the health and safety of employees is a legitimate state interest. Of course, that generalization may be declared as supporting every statute. But to the extent House File 291 provides nebulous health and safety benefits apparently arising from robust collective bargaining rights, what is the rationale for denying those benefits to other public safety employees under the statute? It seems odd to suggest that some public safety employees are entitled to the health and safety benefits afforded by robust collective bargaining and benefits and others are not. Why, say, are park rangers entitled to the health and safety benefits of *49 robust collective bargaining while corrections officers are not? While health and safety benefits may justify robust collective bargaining rights, that benefit is equally applicable to the excluded public safety employees.
C. Examining Means. I now turn to the question of whether there is a rational relationship between the purported goals of the statute and the means chosen by the legislature. For the reasons expressed below, I find it hard to see a rational relationship between the means chosen and the ends asserted.
If labor peace were the goal, why aren't corrections staff, or parole officers, or university police officers, or healthcare workers, provided the benefits of the statute? Other states deal with the potential of strikes in inclusive ways. See, e.g. , Cty. Sanitation Dist. No. 2 v. L.A. Cty. Emps. Ass'n , 38 Cal.3d 564, 214 Cal.Rptr. 424, 699 P.2d 835, 846 & n.26 (1985) (en banc) (noting that ten states permit public employees to strike "unless such strikes endanger the public health, safety, or welfare" and explaining that "[t]he statutes generally prohibit strikes by police and fire-protection employees, employees in correctional facilities, and those in health-care institutions"). If House File 291 is designed to prevent strikes that would jeopardize public safety, it is remarkably underinclusive.
Conversely, is there anything in the record suggesting that public safety employees included in the House File 291 grab bag have threatened to strike? And if they have, have they threatened to strike more frequently or more intensively than the corrections officials and university police? Is there anything in the record suggesting that a strike by gaming enforcement officers would be a threat to public safety? And could it be of the same magnitude as a strike by the many police and fire departments left out in the cold by the thirty percent threshold? Moreover, is the danger of a strike by non-"public safety employees" in a favored bargaining unit somehow of such concern that they, too, need special bargaining rights? These questions, of course, must be answered in the negative, and reveal the arbitrariness and extreme overinclusion of the classifications if they are designed to ensure labor peace.
Most importantly, perhaps, is the absence of a rational connection between doling benefits and preventing strikes. Does the record, or any legislative facts, show that only some public safety employees-i.e., those in unions in which they comprise more than thirty percent of members-need special benefits to convince them not to break the law and strike? Or that, unless they are doled out special benefits, police officers in those units (and I guess gaming enforcement officers, park rangers, and DOT officers) will refuse to do their duty in the face of others breaking the law and striking? Are public safety employees in units in which they comprise less than thirty percent of members somehow better able to resist lawbreaking? Or are those public safety employees less important to public safety?
The classifications in House File 291 are arbitrary if the goal was labor peace. There is no relationship between the classifications, which feature extreme degrees of overinclusion and underinclusion, and labor peace. And the linchpin of the argument advanced in favor of the law-public safety employees might strike in the face of criminal penalty if they are not granted special status-is specious. In the face of such irrationality, I would not uphold the oddball classifications in House File 291.
I now turn to the question of whether the classifications in House File 291 may be supported as health and safety measures. In my view, the slicing and dicing in *50 House File 291 bears no rational connection to protecting health and safety of public employees exposed to greater risks. In short, and as detailed below, the law confers privileges on some public employees and withholds them from others without regard to whether the persons actually face greater danger. It also does not consider whether the privileges are rationally related to protecting health and safety.
The legislature's choice of who may be allowed greater collective bargaining rights is grievously underinclusive towards achieving a goal of protecting health and safety of public employees exposed to danger. Why omit university police officers, corrections officers, jailers, emergency medical service providers, airport firefighters, and others from the category of public safety employees? 2017 Iowa Acts ch. 2, § 1 (codified at Iowa Code § 20.3(11) ). The record shows that many employees in these jobs, especially corrections officers and university police officers, face similar or greater risks than those classified as public safety employees. Psychiatric aides and medical technicians, according to the record, are approximately four times as likely to be injured on the job as are police officers and approximately 150 times as likely to be injured on the job as firefighters. Meanwhile, the number of road safety workers killed in Iowa exceeds the number of police killed in the line of duty.
Moreover, why prevent even some of the public safety employees from being able to attain the collective bargaining benefits that, purportedly, would protect their health and safety? Id. § 6 (codified at Iowa Code § 20.9 ). If the purpose was to protect the health and safety of public employees exposed to danger, or even just the health and safety of an anointed group of those public employees, the statute is fatally underinclusive.
The statute, of course, is also overinclusive if the goal is to protect health and safety of those exposed to greater danger. Why allow supermajorities of non-"public safety employees" to access those benefits? See id. There is no rational explanation.
Further, the limitations on bargaining applicable to the two groups are numerous, and in almost every respect, divorced from health and safety. For instance, House File 291 gives units with thirty percent public safety employees greater rights than other units in arbitrating over wages. Id. What rational connection is there between a cap on the wages that an arbitrator may award to some bargaining units and the health and safety of a portion of the members of other bargaining units? There is none.
Similarly, House File 291 makes seven bargaining subjects mandatory in the case of units with thirty percent public safety employees and prohibited in the case of other units. These subjects are "insurance, leaves of absence for political activities, supplemental pay, transfer procedures, evaluation procedures, procedures for staff reduction, and subcontracting public services." Id. Again, protecting the health and safety of some members of some bargaining units does not rationally connect to giving all of the members of those units the exclusive right to bargain over those subjects.
Indeed, House File 291 requires mandatory negotiation over seventeen specified subjects in collective bargaining with units comprised of at least thirty percent public safety employees. Id. Only one of those subjects is "health and safety matters." Id. And for other unions, none of the seventeen subjects is a mandatory topic of negotiations. Id. The reason for giving the favored units such significantly greater collective bargaining rights is not rationally explainable by a desire to protect the health and safety of a portion of the benefited units.
*51 The situation we face is not like that in Wisconsin. Unlike Wisconsin, as noted above, the Iowa law shuffles the public safety employees into some groups that are entitled to greater benefits and others which are not. Id. In Wisconsin, all public safety employees were entitled to greater collective bargaining rights. Wis. Educ. Ass'n Council , 705 F.3d at 642-43. Moreover, in Iowa, many non-"public safety employees" are granted greater collective bargaining rights while others are not. 2017 Iowa Acts ch. 2, § 6 (codified at Iowa Code § 20.9 ). In Wisconsin, no nonsafety employees were granted greater bargaining rights. Wis. Educ. Ass'n Council , 705 F.3d at 642-43. Further, the federal court addressing the Wisconsin law did not consider whether the gamut of differential collective bargaining rights present in House File 291 bear any rational relation to health and safety. See id. at 656-57 (discussing recertification requirements and elimination of payroll deductions for all public employees). Finally, reliance on federal precedents ignores that, in Iowa, extreme overinclusion and underinclusion can render a statute so arbitrary as to fail the rational basis test. LSCP , 861 N.W.2d at 859 ; RACI , 675 N.W.2d at 7-8.
It seems to me that the extreme overinclusiveness and underinclusiveness of this statute is so striking that it does not pass constitutional muster under RACI principles.
V. Conclusion.
For the above reasons, I would reverse the judgment of the district court.
Cady, C.J., and Wiggins, J., join this dissent.

Some states decline to consider hypothetical justifications in considering equal protection claims brought under state constitutions. See State v. Russell , 477 N.W.2d 886, 889 (Minn. 1991). We need not consider the question here because the statute is infirm even under the hypothetical justifications advanced by the State.